SEATRAIN LINES, INC., A CORPORATION OF THE STATE OF DELAWARE, RESPONDENT-APPELLANT, v. JUAN MEDINA, CLAIMANT-RESPONDENT, AND STATE OF NEW JERSEY, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR AND INDUSTRY, RESPONDENT.

Argued December 17 and 18, 1962—Decided February 4, 1963.

*Mr. Laurence Reich* argued the cause for appellant (*Messrs. Carpenter, Bennell & Morrissey,* attorneys; *Mr. Charles B. Collins* and *Mr. Laurence Reich,* of counsel).

*Mr. Dominic J. Hart* argued the cause for respondent (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney for intervenor-respondent, *Mr. Herman D. Ringle,* of counsel).

The opinion of the court was delivered by

HANEMAN, J. Juan Medina (Medina), a New Jersey resident, was employed as a seaman by Seatrain Lines, Inc. (Seatrain), which corporation is engaged in the transportation of cargo on the high seas and navigable waters of the United States, between Edgewater, New Jersey; Savannah, Georgia; New Orleans, Louisiana; and Texas City, Texas. His regular wage was $86.59 per week. Medina was a member of the Seafarers International Union of North America (Union) which represented him for collective bargaining purposes. The collective bargaining agreement between Seatrain and the Union provided, in part:

"*Maintenance and Cure.* When a member of the Unlicensed Personnel is entitled to maintenance and cure under Maritime Law, he shall be paid maintenance at the rate of $8.00 per day for each day or part thereof, of entitlement. The payment due hereunder shall be paid to the man weekly."

On February 22, 1961, while so employed on the high seas aboard the S. S. Seatrain, New York, Medina reported a skin infection to the master of the vessel. Upon arrival at Edgewater on February 24, 1961, he was sent by Seatrain to the U. S. Public Health Service Hospital at Staten Island, New York, where he was examined, certified unfit for duty, and treated as an outpatient without cost to him. He continued totally disabled, incapable of performing the duties of his employment until April 17, 1961. Medina was paid $8 per day by Seatrain for each day of this unemployment.

Seatrain maintains a self-insured plan for employee temporary disability benefits under the Temporary Disability Benefits Law, *N. J. S. A.* 43:21–25 *et seq.*, approved by the Disability Service of the New Jersey Division of Employment Security (Division). *N. J. S. A.* 43:21–32. Pursuant to *N. J. S. A.* 43:21–29, Medina filed a claim with Seatrain for benefits at the rate of $35 per week, which was denied. He appealed to the Private Plan Hearing Officer of the Division (Hearing Officer). *N. J. S. A.* 43:21–50. On February 19, 1962, the Hearing Officer rendered a Determination of Facts and Order, which was amended on March 29, 1962, directing that Seatrain pay disability benefits to Medina for the period of February 26, 1961 through April 17, 1961, less the required waiting period, at the rate of $35 per week. Seatrain appealed to the Appellate Division. The Division was granted leave to intervene as a respondent. Prior to the argument in the Appellate Division, this court certified the appeal on its own motion. *R. R.* 1:10–1(a).

Seatrain argues that *N. J. S. A.* 43:21–30, which reads:

"No benefits shall be required or paid under this act for any period with respect to which benefits are paid or payable under any unemployment compensation or similar law, or *under any disability or cash sickness benefit or similar law*, of this State or of any other State or *of the Federal Government.* Nor shall any benefits be required or paid under this act for any period with respect to which benefits, other than benefits for permanent partial or permanent total disability previously incurred, are paid or are payable on account of the disability of the covered individual under any workmen's compensation law, occupational disease law, or similar legislation, of this State or of any other State or the Federal Government. * * * Disability benefits otherwise required hereunder shall be reduced by the amount paid currently under any governmental or private retirement, pension or permanent disability benefit or allowance program to which his most recent employer contributed on his behalf." (Emphasis supplied.)

bars the recovery by Medina of further disability benefits. It reasons that the $8 per day which was paid to him during his unemployment for "maintenance" constitutes a benefit "paid * * * under * * * [an] unemployment compensation

\* \* \* or \* \* \* disability or cash sickness benefit or similar law \* \* \* of the Federal Government."

The Division admits that the monies which Medina received from Seatrain were paid under the general maritime law as a part of a requirement to provide maintenance and cure. It argues, however, that the word "law" bears the restricted connotation of "statutory law." It reasons that the payments for maintenance and cure having been made in accordance with judicial maritime decisions and not by virtue of a legislative enactment, further payment of benefits under the Temporary Disability Benefits Law would not constitute a prohibited duplication. The Division further urges that even if the word "law" is accorded a meaning of wider scope, as argued by Seatrain, the maritime law which requires payment for "maintenance and cure" is not similar to an unemployment compensation or disability or cash sickness benefit law.

We are therefore confronted with a primary and a possible secondary problem, *i. e.*, (1) whether the word "law" as used in *N. J. S. A.* 43 :21–30 restricts the prohibition against the duplication of mandatory payment of benefits to such payments made by virtue. of statutory enactments, and, if the answer to this query is in the negative, (2) whether the payment of maintenance and cure is required by a law which falls within the categories of "unemployment compensation, \* \* \* disability or cash sickness benefit or similar law \* \* \* of the Federal Government."

The first question for consideration, therefore, is the meaning of "law" as used in the subject statute.

 In statutory construction it is essential to ascertain the purpose for which the statute was enacted (*Glick v. Trustees of Free Public Library*, 2 *N. J.* 579, 585 (1949)) and the mischief it was intended to eliminate. *San-Lan Builders, Inc. v. Baxendale*, 28 *N. J.* 148, 155 (1958). All parts of the statute must be read so that they are in alignment with the intent of the entire act. *Febbi v. Board of Review, Division of Employment Security*, 35 *N. J.* 601

(1961); *Sperry & Hutchinson Co. v. Margetts,* 15 *N. J.* 203, 209 (1954). In *Febbi,* it was stated, at *p.* 606:

"It is a cardinal rule of statutory construction that the intention of the Legislature is to be derived from a view of the entire statute and that all sections must be read together in the light of the general intent of the act so that the auxiliary effect of each individual part of a section is made consistent with the whole."

In *Giles v. Gassert,* 23 *N. J.* 22 (1956), the court said, at *pp.* 33–34:

"The sense of a law is to be collected from its object and the nature of the subject matter, the contextual setting, and the statutes in *pari materia*; and the import of a particular word or phrase is controlled accordingly. Isolated terms cannot be invoked to defeat a 'reasonable construction.'"

This court, in *Butler v. Bakelite Co.,* 32 *N. J.* 154 (1960), said in reference to *N. J. S. A.* 43:21–25 *et seq.,* at *pp.* 160 and 161:

"For present purposes, it may be noted that employee welfare legislation in New Jersey commenced with the workmen's compensation act providing benefits for work-connected disability regardless of fault. The next step was the unemployment compensation law (*R. S.* 43:21–1 *et seq., N. J. S. A.*), enacted to lighten the burden of economic insecurity on the worker due to involuntary unemployment caused without fault on his part. *R. S.* 43:21–2, *N. J. S. A.* A condition of eligibility for benefits is that the unemployed individual be able to [work] and [is] available for work (unless his employer has placed him on involuntary vacation without pay for a specified period). *N. J. S. A.* 43:21–4(c). * * *

From a social standpoint there remained gaps in the benefit scheme. There was no protection against wage loss resulting from disabling, involuntary, non-compensable accident or sickness suffered while in employment or from loss of unemployment compensation benefits because of physical inability to work by reason of a similar occurrence while out of work. The temporary disability benefits law was enacted in 1948 (*L.* 1948, *c.* 110; *N. J. S. A.* 43:21-25 *et seq.*) to cover the former situation and fill that gap (*N. J. S. A.* 43:21–26), either by means of a state-operated fund or private plan set up and run by an employer in accordance with the statute. *Janovsky v. American Motorists Insurance Co.,* 11 *N. J.* 1, 4 (1952); *Potts v. Barrett Division, Allied Chemical & Dye Corporation,* 48 *N. J. Super.*

554, 559 (*App. Div.* 1958) ; *Bogda v. Chevrolet-Bloomfield Division, General Motors Corporation,* 8 *N. J. Super.* 172 (*App. Div.* 1950). The same statute (*L.* 1948, *c.* 110, § 20) also filled the second gap by amending the benefit eligibility section of the unemployment compensation law. *N. J. S. A.* 43:21–4. Subsections (f) and (g) were added thereto, the former providing that where an unemployed individual suffered a non-compensable accident or sickness resulting in his total disability to perform any work for remuneration and would be entitled to unemployment compensation benefits except for his inability to work, he should nonetheless receive such benefits, paid however, from the state fund created under the temporary disability benefits law (rather than from the unemployment compensation fund) and not charged to any employer in computing experience rate for unemployment compensation contributions."

Thus, the New Jersey employee welfare plan for alleviation of wage loss, which had its genesis with the Workmen's Compensation Act, was completed by *L.* 1948, *c.* 110 which amended and supplemented the Unemployment Compensation Law, adding the Temporary Disability Benefits Law. *Butler v. Bakelite Co., supra; Felice v. Felice,* 34 *N. J. Super.* 388 (*App. Div.* 1955).

In seeking the intent of *N. J. S. A.* 43:21–30 consideration must also be given to the overall purpose of the Temporary Disability Benefits Law, of which it is a part. The purposes of the Temporary Disability Benefits Law, in turn must be related to the objectives of the Unemployment Compensation Law (*R. S.* 43:21–1 *et seq.*), of which it is an integral component, and to other statutes standing in *pari materia.*

The general purpose of statutes of this nature is aptly expressed in 2 Larson, *Workmen's Compensation Law,* § 19.10 (1961), as follows:

"Wage loss legislation is designed to restore to the worker a portion, such as one-half to two-thirds, of wages lost due to the three major causes of wage-loss; physical disability, economic unemployment, and old age. The crucial operative fact is that of wage loss; the cause of the wage loss merely dictates the category of legislation applicable. Now if a workman undergoes a period of wage loss due to all three conditions, it does not follow that he should receive three sets of benefits simultaneously and thereby recover more than his actual wage. He is experiencing only one wage loss and, in any

logical system, should receive only one wage-loss benefit. This conclusion is inevitable, once it is recognized that workmen's compensation, unemployment compensation, nonoccupational sickness and disability insurance, and old age and survivor's insurance are all parts of a system based upon a common principle. If this is denied then all coordination becomes impossible and social legislation becomes a grab-bag of assorted unrelated benefits."

See also *Renshaw v. United States Pipe & Foundry Co.,* 30 *N. J.* 458 (1959).

Consistent with the foregoing statement of *Larson,* the Unemployment Compensation Law did not seek to compensate a worker for his entire wage loss arising from unemployment not attributable to his fault or act, and so make him entirely whole in this respect, but rather to furnish him some income less than his total earning loss, in order to minimize the financial impact of such unemployment. See *Battaglia v. Board of Review of the Division of Employment Security,* 14 *N. J. Super.* 24, 27 (*App. Div.* 1951) ; *Hancock v. Board of Review,* 46 *N. J. Super.* 418, 421 (*App. Div.* 1957).

Similarly, the Legislature has defined the purpose of the Temporary Disability Benefits Law by *N. J. S. A.* 43 :21–26, which reads in part:

"The public policy of this State, already established, is to protect employees against the suffering and hardship generally caused by involuntary unemployment. But the unemployment compensation law provides benefit payments to replace wage loss caused by involuntary unemployment only so long as an individual is 'able to work, and is available for work,' and fails to provide any protection against wage loss suffered because of inability to perform the duties of a job interrupted by illness. Nor is there any other comprehensive and systematic provision for the protection of working people against loss of earnings due to non-occupational sickness or accident.

\* \* \* \* \* \* \* \*

It has been found that existing voluntary plans for the payment of cash sickness benefits cover less than one-half of the number of working people of this State who are now covered by the unemployment compensation law, and that even this degree of voluntary protection affords uneven, unequal and sometimes uncertain protection among the various voluntary benefit programs. It is therefore desirable and necessary to fill the gap in existing provisions for protection against the loss of earnings caused by involuntary unemployment, by

extending such protection to meet the hazard of earnings loss due to inability to work caused by non-occupational sickness or accident.

The foregoing facts and considerations require that there be a uniform minimum program providing in a systematic manner for the payment of reasonable benefits to replace partially such earnings loss and to meet the continuing need for benefits where an individual becomes disabled during unemployment. In order to maintain consumer purchasing power, relieve the serious menace to health, morals and welfare of the people caused by insecurity and the loss of earnings, to reduce the necessity for public relief of needy persons, and in the interest of the health, welfare and security of the people of this State, such a system, enacted under the police power, is hereby established, requiring the payment of reasonable cash benefits to eligible individuals suffering accident or illness which is not compensable under the workmen's compensation law."

We come, therefore, to the consideration of whether the word "law" as used in *N. J. S. A.* 43 :21–30 should be strictly construed to prohibit a duplication of benefits only in situations wherein the duplicated funds have been acquired under a statutory enactment.

The word "law" has been accorded a variety of meanings, depending upon the context in which it was employed. *Warren v. United States,* 340 *U. S.* 523, 71 *S. Ct.* 432, 95 *L. Ed.* 503 (1951), involved the effect to be given a proviso within paragraph 2 of Article 2 of the Shipowners Liability Convention, permitting exceptions to the general rule requiring maintenance and cure, by "national laws or regulations." The court said, at *pp.* 526–527, 71 *S. Ct.,* at *p.* 434:

"Our conclusion is that the exceptions permitted by paragraph 2 are operative by virtue of the general maritime law and that no Act of Congress is necessary to give them force.

The language of paragraph 2, in its ordinary range of meaning, easily permits that construction. It is 'national laws or regulations' which may make exceptions. The term law in our jurisprudence usually includes the rules of court decisions as well as legislative acts. That was held in *Erie R. Co. v. Tompkins,* 304 *U. S.* 64, 58 *S. Ct.* 817, 82 *L. Ed.* 1188, to be true of the phrase 'the laws of the several states' as used in the first Judiciary Act. 1 *Stat.* 73, § 34. No reason is apparent why a more restricted meaning should be given 'national laws or regulations.' The purpose of the Convention would not be served by the narrow meaning."

■ The legislative purpose in the Temporary Disability Benefits Law, as previously pointed out, is served by construing the word "law" in a vein similar to its construction in *Warren, supra*. To interpret the word "law" to mean "statutory law or common law rule or doctrine" is to maintain compatibility with the legislative desire to so limit the employee's right to receive benefits. In *Sperry & Hutchinson Co., supra*, the court said, 15 *N. J.*, at *p.* 209 :

"The intention of the lawgiver is taken or presumed according to what is consonant to reason and good discretion. The particular words are to be made responsive to the reason and spirit of the enactment. *Wright v. Vogt*, 7 *N. J.* 1 (1951). The purpose of construction is to bring the operation of the statute within the apparent intention of the Legislature. *Nagy v. Ford Motor Co.*, 6 *N. J.* 341 (1951). When the general intent is found, general words may be restrained accordingly, and those of narrower significance expanded to effectuate that intent. *Glick v. Trustees of Free Public Library*, 2 *N. J.* 579 (1949). The true meaning of any clause or provision ordinarily is that which best comports with the subject and general object of the act. *Maritime Petroleum Corporation v. City of Jersey City*, 1 *N. J.* 287 (1949)."

The sentence of *N. J. S. A.* 43:21–30 which succeeds the sentence with which we are concerned further strengthens our judgment that the Legislature intended such construction. It reads:

"Nor shall any benefits be. required or paid under this act for any period with respect to which benefits, other than benefits for permanent partial or permanent total disability previously incurred, are paid or payable on account of the disability of the covered individual under any workmen's compensation law, occupational disease law, *or similar legislation*, of this State or of any other State or the Federal Government." (Emphasis supplied.)

Here the statute employs the words "similar legislation." It must be concluded that the expressed difference in these two juxtaposed sentences was intentionally utilized to convey two separate ideas. These are words of art obviously employed to differentiate the nature of the prohibition against duplication of payments in each defined category. The use

of "law" as expressive of a broader meaning than "legislation" is thus affirmatively disclosed.

We proceed to our second question—whether payments for maintenance and cure are of a similar nature to payments for "unemployment * * * disability or cash sickness benefit."

The ancient right of a seaman to maintenance and cure has been described in *Bartholomew v. Universe Tankships, Inc.*, 279 *F. 2d* 911 (*2 Cir.*, 1960), as follows:

"Few legally protected rights have so ancient and international a lineage as the right of a mariner, injured or falling ill in the service of his ship, to medical treatment, food and lodging, and wages. As the Supreme Court has very recently noted: 'Markedly similar provisions granting relief of this nature are to be found in the Laws of Oleron, promulgated about 1150 A. D. by Eleanor, Duchess of Giuenne; in the laws of Wisbuy, published in the following century; in the laws of the Hanse Towns, which appeared in 1597; and in the Marine Ordinances of Louis XIV published in 1681.' Mitchell v. Trawler Racer, Inc., [362 W. S. 539] 80 S. Ct. 926, 929 [4 L. Ed. 2d 941]. In the United States the seaman's rights to maintenance and cure were first recognized by Mr. Justice Story in two cases which he decided on circuit, Harden v. Gordon, C.C.D Me. 1823, 11 Fed. Cas. p. 480, No. 6,047, and Reed v. Canfield, C.C.D. Mass. 1832, 20 Fed. Cas. 426, No. 11,641. In Harden v. Gordon, supra, after an extensive survey Mr. Justice Story declared that he had 'not been able to detect a single instance, in which the maritime laws of any foreign country throw upon a seaman disabled or taken sick in the service of the ship, without their own fault, the expenses of their cure.' [11 Fed. Cas. 482.] Mr. Justice Story found these rights desirable not only on humanitarian grounds but also because they served 'the great public policy of preserving this important class of citizens for the commercial service and maritime defence of the nation.' In upholding the jurisdiction of a court of admiralty over this subject matter he stated that the right to maintenance and cure 'constitutes in the contemplation of law a part of the contract for wages, and is a material ingredient in the compensation of the labor and services of the seaman.'

'[T]he vitality of a seaman's right to maintenance and cure has not diminished through the years.' Mitchell v. Trawler Racer, Inc., supra, [362 U. S. 539] 80 S. Ct. at page 929 [4 L. Ed. 2d 941]. It has become established that the obligation of the shipowner attaches as a result of the relationship of employment without any regard for the form of the contract or the will of the contracting parties. Cortes v. Baltimore Insular Line, 1932, 287 U. S. 367, 53 S. Ct. 173, 77 L. Ed. 368."

The doctrine has been as recently recognized as *Vaughan v. Atkinson*, 369 *U. S.* 527, 82 *S. Ct.* 997, 8 *L. Ed.* 2d 88 (1962).

■ The duty to make such provision is one imposed by the law itself as annexed to the contract of employment. *Cortes v. Baltimore Insular Line*, 287 *U. S.* 367, 53 *S. Ct.* 173, 77 *L. Ed.* 368 (1932).

■ The doctrine of maintenance and cure, being a part of the general maritime law, is a part of the system of federal laws. In *Knickerbocker Ice Co. v. Stewart*, 253 *U. S.* 149, at *p.* 160, 40 *S. Ct.* 438, at *p.* 440, 64 *L. Ed.* 834 (1920), the court said:

"The Constitution itself adopted and established, as part of the laws of the United States, approved rules of the general maritime law and empowered Congress to legislate in respect of them and other matters within the admiralty and maritime jurisdiction."

An analysis of the basic features of maintenance and cure and a comparison thereof with the various provisions of the Temporary Disability Benefits Law demonstrate their compatible purposes although there are some differences in the degree of compensation rendered.

(1) In each case, the obligation of the employer to furnish benefits to the employee exists independently of any fault on his part and regardless of whether the disability was incurred by the employee within or without the course of his employment. See, *e.. g., Calmar S. S. Corp. v. Taylor*, 303 *U. S.* 525, 58 *S. Ct.* 651, 82 *L. Ed.* 993 (1938); *Gilmore & Black, The Law of Admiralty*, §§ 6–8, *p.* 257 (1957). Compare *N. J. S. A.* 43:21–29, which is substantially equivalent in scope.

(2) The right of the seaman to recover maintenance and cure benefits from his employer is subject to forfeiture only where the disability was incurred by the seaman through his own gross and willful misconduct—a term construed so liberally in favor of the employee that benefits are rarely denied on that basis. See, *e. g., Warren v. United States, supra;*

*Farrell v. United States,* 336 *U. S.* 511, 69 *S. Ct.* 707, 93 *L. Ed.* 850 (1949) ; *Aguilar v. Standard Oil Co.,* 318 *U. S.* 724, 63 *S. Ct.* 930, 87 *L. Ed.* 1107 (1943) ; *Calmar S. S. Corp. v. Taylor, supra.* Compare *N. J. S. A.* 43:21–39(d), which provides a substantially similar restriction upon the granting of benefits.

(3) The maritime employer's obligation to furnish maintenance and cure commences immediately upon the occurrence of the disability and continues as long as the seaman remains temporarily disabled. See, *e. g., Koslusky v. United States,* 208 *F.* 2d 957 (2 *Cir.,* 1953), where maintenance was required to be paid for a period exceeding six years. Compare *N. J. S. A.* 43:21–39(a) which requires a waiting period of one week before any benefits are payable and limits the period of payments to 26 weeks.

(4) The maintenance rate generally applied by the admiralty courts during the past decade has been fixed at $8 per day, or $56 per week. See, *e. g., Irwin v. United States,* 111 *F. Supp.* 912 (*E. D. N. Y.* 1953), aff'd 236 *F.* 2d 774 (2 *Cir.,* 1956). Moreover, a rate consistent with the changing needs of the employee is virtually assured by the policy of the admiralty courts to adopt the maintenance rates stipulated by agreement between the employer and the employee's collective bargaining representative, as in the case at bar. See, *e. g., Yates v. Dann,* 124 *F. Supp.* 125 (*D. Del.* 1954), rev'd on other grounds 223 *F.* 2d 64 (3 *Cir.,* 1955). Compare the payments provided under *N. J. S. A.* 43:21–40 which at the time here involved allowed a maximum payment of $35 per week (increased by amendment to $50. *L.* 1961, c. 43, *p.* 474, § 12).

We conclude, therefore, that the payments for maintenance and cure received by Medina were payments "under any unemployment compensation * * * disability or cash sickness benefit or similar law * * * of the Federal Government."

Reversed.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*For affirmance*—None.