800 A.2d 157 (2002)
352 N.J. Super. 285
In the Matter of the Joint Petition of BOARDWALK REGENCY CORPORATION and Gary DiBartolomeo for Approval of Severance Payment, Petitioner-Appellant,
v.
NEW JERSEY CASINO CONTROL COMMISSION, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued March 20, 2002.
Decided June 21, 2002.
*160 Stephen Hankin, Atlantic City, argued the cause for appellant (Hankin, Sandson, Sandman, Bradley & Palladino, attorneys; Mr. Hankin, on the brief).
Steven M. Ingis, Assistant General Counsel, argued the cause for respondent *161 (John R. Zimmerman, General Counsel; Susan L. Myers, Senior Counsel, on the brief; Mr. Ingis, on the brief).
Before Judges KING, CUFF and WINKELSTEIN. *158
*159 The opinion of the court was delivered by WINKELSTEIN, J.A.D.
Gary DiBartolomeo rose through the ranks of the Atlantic City casino industry to become the president of Caesars Casino on January 4, 2000.[1] He was also a compulsive gambler. By order of February 28, 2001, DiBartolomeo's casino key employee license was revoked by the New Jersey Casino Control Commission (Commission) which found him unqualified because he failed to establish his "good character, honesty[,] integrity and financial responsibility."[2] On the same date, the Commission entered an order invalidating the terms of a proposed severance agreement between Caesars and DiBartolomeo. In this appeal, DiBartolomeo argues that the Commission did not have the authority to review the severance agreement, and that even if it did, its actions improperly interfered with DiBartolomeo's contract rights. We disagree. We conclude that the Commission has the authority to review and invalidate agreements between casinos and their employees. We also find that the Commission's decision not to approve the proposed severance agreement between DiBartolomeo and Caesars was not arbitrary and was supported by substantial credible evidence in the record. Accordingly, we affirm.

I
DiBartolomeo had been employed in the Atlantic City gambling industry for almost his entire adult life. He was first licensed by the Commission in June 1979 and began his employment, at age twenty-three, as a craps dealer. From 1979 to 1989, he worked for both Caesars and the Golden Nugget Casino as a dealer and craps supervisor. In 1989 he became the executive host at the Showboat Casino. In 1990 he was employed by the Taj Mahal, first as an executive host, later as regional director of customer development, and from June 1993 to June 1994, as vice-president for customer development. In June 1994 he became assistant vice-president of national marketing for an enterprise known as Caesars World Market Corporation, a licensed junket enterprise. On July 14, 1995 DiBartolomeo was appointed Caesars' vice-president of customer development; he was promoted to president in January 2000.
DiBartolomeo was first granted a casino key employee license in March 1992. See N.J.S.A. 5:12-89a. He applied for renewal of his key license in September 1993, in connection with his position at the Taj Mahal. In a report dated August 23, 1994, the State of New Jersey, Division of Gaming Enforcement (Division), recommended that his key license not be renewed because he had outstanding gambling debts, had surreptitiously borrowed funds to pay off his losses, and had concealed or misrepresented certain information in his license application. Subsequently, DiBartolomeo reached an agreement with the Division for issuance of the license subject to conditions. In reliance upon this agreement, *162 the Commission found DiBartolomeo qualified, and renewed his key license through March 31, 1997, subject to the following conditions: (1) for the duration of the license term, DiBartolomeo was prohibited from participating in any personal casino gaming activity in any jurisdiction and (2) he was to attend group counseling with a recognized organization, such as Gamblers Anonymous, or attend counseling with a licensed therapist on a weekly basis and provide documentary proof of his attendance on a quarterly basis to the Division and the Commission. In the agreement, DiBartolomeo represented that he had "not gambled and/or incurred any other gambling debts at least since the commencement of this action in March 1994."
On March 18, 1997 the Commission extended the expiration date of DiBartolomeo's license to March 31, 1998.[3] The gambling prohibition condition was extended but the counseling condition was not. He continued to gamble. However, during the renewal proceedings to extend his license beyond March 31, 1998, he concealed his gambling activities. As a result, on April 15, 1998 the Commission renewed DiBartolomeo's license without conditions through March 31, 2002.
When DiBartolomeo became president of Caesars, he entered into an employment agreement with BRC. He was to serve as president from January 4, 2000 to January 3, 2003. His annual base salary was $362,000. The agreement also provides that "[p]ursuant to the policies of Employer, a bonus payment may be made in addition to Base Salary on an annual basis in such amount as is determined by the Employer in its sole discretion." The agreement also includes additional benefits: "participation in the management incentive plan, medical and hospitalization, life insurance, long term disability, death and retirement plans, and the like...." DiBartolomeo was subject, pursuant to paragraph eight of the agreement, to termination for, among other things, a failure to qualify "under any suitability or licensing requirement...."
Because Caesars' casino license was to expire on June 30, 2000, a casino license renewal hearing was scheduled before the Commission for June 7, 2000. As part of Caesars' casino license renewal application, DiBartolomeo, as president of Caesars, was required to affirmatively establish his qualifications under the Casino Control Act (Act), N.J.S.A. 5:12-1 to -210. See N.J.S.A. 5:12-80a. In connection with the renewal of Caesars' license, in April 2000, the Division investigated whether DiBartolomeo violated the terms previously imposed upon his key employee license. As a result of the investigation, it became evident that the Division would not report favorably on DiBartolomeo's qualifications prior to the expiration of Caesars' casino license at the end of June. It therefore became necessary to remove DiBartolomeo from the list of people who had to affirmatively establish their qualifications under the Act in order for Caesars to have its license renewed.
To accomplish this, DiBartolomeo and BRC filed a joint petition with the Commission seeking a declaratory ruling that DiBartolomeo be granted a leave of absence. On May 24, 2000 the Commission approved a six-month leave of absence, from May 22 to November 22, 2000, with full pay and health benefits. The Commission also found that DiBartolomeo was no longer required to qualify in connection with the renewal of Caesars' license, provided he "be found qualified before he *163 resumes or assumes the duties or exercises the powers of any position requiring his qualification or licensure...." By effectively removing DiBartolomeo from qualifier status, Caesars' license could be, and was, renewed without resolving the issue of DiBartolomeo's qualifications.
The Division continued to investigate whether DiBartolomeo had violated the conditions of his license. On August 15, 2000 the Division issued a sixty-seven page report recommending that DiBartolomeo not be found qualified to resume the position of president of Caesars, and that his key employee license be revoked. The Division cited a litany of regulatory violations and inappropriate conduct. It found that DiBartolomeo's good character, honesty and integrity were adversely impacted as a result of his
misrepresentation in the stipulated settlement agreement leading to the grant of a conditional license in 1995 that he had not gambled when, in fact, he had; at least 23 violations of the Commission's orders not to gamble; at least 29 violations of the Commission's order to attend weekly counseling for gambling; misrepresentations to the Division regarding the six counseling visits with his private counselor; gambling in Atlantic City in violation of Section 100n of the Act;[4] the structured cash redemption of the $40,000 MGM marker; the use of the same airplane ticket to acquire a credit on a gambling debt and to obtain reimbursement from his employer; the failure to properly account to the I.R.S. for his gambling winnings; and, the failure to truthfully advise his new employer of significant information regarding his license at the time he was promoted to the presidency of BRC.
As a result of these findings, the Division took the position that DiBartolomeo lacked the requisite financial stability, responsibility, good character, honesty and integrity to be qualified as an officer of a casino licensee or to be licensed as a casino key employee. See N.J.S.A. 5:12-89 & 85c.
On October 2, 2000 DiBartolomeo's employment agreement was amended to allow him to assume a position other than president of Caesars. It also increased his period of paid medical leave from six months to eighteen months.
On November 3, 2000 DiBartolomeo and BRC filed a joint petition with the Commission requesting an extension of his paid leave pending a hearing before the Commission on his qualifications and suitability for continuing licensure. The Division did not oppose the relief sought. On November 14, 2000 DiBartolomeo resigned as president of Caesars. The next day he became Caesars' vice-president of customer development but remained on leave. His salary was unchanged.
Also on November 15, 2000, the Commission allowed the continuation of DiBartolomeo's medical benefits, so treatment of his "compulsive gambling condition" could continue, but denied the remainder of the relief requested in the petition. The following day, November 16, 2000, hearings began before Commission Chairman James R. Hurley, acting as a hearing officer, to determine if DiBartolomeo was qualified to retain his key employee casino license. See N.J.S.A. 5:12-107a. The hearings continued until November 30, 2000, when Hurley reserved decision.
On December 11, 2000, while awaiting Hurley's decision, DiBartolomeo and BRC filed another joint petition with the Commission. This petition sought approval of the proposed severance agreement. The petition was in the form of a letter *164 signed by BRC's and DiBartolomeo's attorneys; it did not include a proposed written severance agreement. According to the petition, for the 2000 calendar year, DiBartolomeo would receive a $362,000 bonus, "salary continuation" payments equal to fifty percent of his base salary ($362,000) for 2001 and 2002, and continuation of his health benefits package (estimated at $30,000) through the expiration of his contract on January 3, 2003. The severance package, which totaled approximately $750,000, was to be paid in one lump sum.
According to the petition, the Commission's permission for BRC and DiBartolomeo to enter into the severance agreement was requested to allow DiBartolomeo to be "reasonably provided for in light of his past service and significant contributions to BRC. BRC has, in the past, arranged for severance payments and benefits to many executive employees who left the Company after a period of significant and diligent service."
In the petition DiBartolomeo also took the position that the Commission did not have the authority to disapprove the proposed severance agreement. Rather, he argued that N.J.S.A. 5:12-104b, upon which the Commission had in the past relied to review agreements to which a casino was a party, applied only to a casino licensee's contractual agreements with its vendors, not to agreements with its own employees. The Commission heard oral argument on this petition on January 3, 2001. The Division did not object to the relief requested. The Division maintained, however, that the Commission possessed the discretionary authority under Section 104b of the Act to disapprove all or a portion of the proposed agreement. The Commission reserved decision.
On January 22, 2001 Hurley issued his Initial Decision on the license issue; he recommended: 1) that DiBartolomeo's casino key employee license be revoked, 2) that DiBartolomeo be found unqualified to hold any position requiring qualification under the Act, and 3) that in the absence of a showing of good cause, DiBartolomeo be prohibited from employment by a casino licensee in any capacity. In rendering his decision, Hurley emphasized that DiBartolomeo's license was being revoked because he "failed to demonstrate the affirmative qualification for licensure of good character, honesty and integrity," and not because DiBartolomeo was a compulsive gambler. Among other things, Hurley found that DiBartolomeo had engaged in a pattern of deceit, and that he had even referred to himself as a "master of deception." Based on the testimony at the hearings, Hurley agreed with the Division that DiBartolomeo had gambled on many occasions after being ordered not to, and had lied to licensing authorities, his employer and his therapist. Hurley found portions of DiBartolomeo's testimony not credible. He also found that DiBartolomeo's pathological gambling problem did not excuse either his culpability for his conduct or his "pattern of deceit and dishonesty in trying to conceal the depths of his gambling problem from this state's gaming regulators." He concluded that DiBartolomeo needed to be held accountable for his actions because his gambling addiction did not prevent him from acting of his own volition in his pattern of deceit. Hurley also concluded that DiBartolomeo did not clearly and convincingly demonstrate his financial responsibility at the time of the hearing.
On February 28, 2001 the Commission adopted Hurley's decision. It revoked DiBartolomeo's license and prohibited him from employment with a casino licensee in any capacity. Also on February 28, the Commission decided the petition for approval of the proposed severance agreement. The Commission allowed payment *165 of a bonus to DiBartolomeo for the period he actually worked as president of CaesarsJanuary 4, 2000 to May 22, 2000and permitted continuation of his health benefits through the expiration of his employment contract on January 3, 2003. It denied any bonus beyond the commencement of his leave of absence on May 22, 2000, as well as the "salary continuation" payments.
On March 12, 2001 DiBartolomeo filed a motion for reconsideration and to supplement the record. See N.J.S.A. 5:12-107d(1). BRC did not join in the motion, which the Division opposed. On April 25, 2001 the Commission denied the motion for reconsideration; the motion to supplement the record was granted in part and denied in part. On May 31, 2001 the Commission issued an opinion amplifying the reasons for its decisions.

II
We first address whether the Commission has the authority to review employment agreements between casinos and their employees. DiBartolomeo argues that the Commission's reliance upon N.J.S.A. 5:12-104b as the basis for its authority was error, asserting that the provision only applies to casino licensees' contractual agreements with vendors. The State submits that Section 104b, when read in the context of the entire casino regulatory scheme, provides the Commission with the requisite authority to review and invalidate such agreements.
The pertinent portion of N.J.S.A. 5:12-104b reads:
b. Each casino applicant or licensee shall maintain, in accordance with the rules of the commission, a record of each written or unwritten agreement regarding the realty, construction, maintenance, or business of a proposed or existing casino hotel or related facility. The foregoing obligation shall apply regardless of whether the casino applicant or licensee is a party to the agreement. Any such agreement may be reviewed by the commission on the basis of the reasonableness of its terms, including the terms of compensation, and of the qualifications of the owners, officers, employees, and directors of any enterprise involved in the agreement, which qualifications shall be reviewed according to the standards enumerated in section 86 of this act. If the commission disapproves such an agreement or the owners, officers, employees, or directors of any enterprise involved therein, the commission may require its termination.
In addressing its authority to review the severance agreement, the Commission observed that it "has always [] interpreted [Section 104b] broadly," in recognition of its statutory mission to "strictly regulate the casino gaming industry in order to preserve and foster public confidence in the integrity of the regulatory process and the casino industry." The Commission submits that the proposed severance agreement "entails the `business' of the casino licensee[,]" and its "regulatory scrutiny was particularly appropriate" here, given that DiBartolomeo was found unsuitable for licensure.
Administrative agencies have only such powers as are conferred on them by the Legislature. Young v. Western Elec. Co., 96 N.J. 220, 225, 475 A.2d 544 (1984) (citations omitted). These powers include those "expressly granted which in turn are attended by those incidental powers which are reasonably necessary or appropriate to effectuate the specific delegation." In re Regulation F-22, Office of Milk Indus., 32 N.J. 258, 261, 160 A.2d 627 (1960) (citation omitted). In interpreting a statute, a court's ultimate aim is to discern *166 and apply the intent of the Legislature. State v. Gonzalez, 142 N.J. 618, 627, 667 A.2d 684 (1995) (citations omitted). Legislative intent is to be gleaned from the entire statute, to be read so that each provision aligns with the intent of the entire act. Seatrain Lines, Inc. v. Medina, 39 N.J. 222, 226-27, 188 A.2d 169 (1963) (citations omitted); see also Jimenez v. Baglieri, 152 N.J. 337, 351, 704 A.2d 1285 (1998) ("The inquiry in the ultimate analysis is to determine the true intention of the law; and, to this end, the particular words are to be made responsive to the essential purpose of the law.") (citation omitted). "The plain language of a statute is paramount in determining its proper meaning and application unless that language is inconsistent with manifest legislative intent or another meaning expressly indicated." Cox v. Cox, 335 N.J.Super. 465, 476-77, 762 A.2d 1040 (App.Div.2000) (citing Innes v. Innes, 117 N.J. 496, 505-512, 569 A.2d 770 (1990)).
Moreover, an appellate court will accord substantial deference to an interpretation of a statute by the agency charged with enforcing it. Medical Soc'y of New Jersey v. New Jersey Dep't of Law and Pub. Safety, 120 N.J. 18, 26-27, 575 A.2d 1348 (1990) (citation omitted); see also In re Public Serv. Elec. and Gas Co's Rate Unbundling, 167 N.J. 377, 384, 771 A.2d 1163 (2001) (stating the agency's interpretation and implementation of a statute it is responsible for enforcing and its interpretation of its own regulations are entitled to great weight) (citations omitted). Thus, an agency's interpretation will prevail "so long as it is not plainly unreasonable." Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 327, 478 A.2d 742 (1984) (citations omitted).
With these principles in mind, we turn to whether the Commission has the authority to review, and ultimately invalidate, all or a portion of the severance agreement. We begin with the proposition that the State has a strong interest in "promoting scrupulous conduct by [the] casino industry and regulatory officials." Greenberg v. Kimmelman, 99 N.J. 552, 560, 494 A.2d 294 (1985). Regulatory provisions of the Act are "designed to extend strict State regulation to all persons, locations, practices and associations related to the operation of licensed casino enterprises...." N.J.S.A. 5:12-1b(6). "Because of the need for integrity, public confidence and trust," all persons with criminal backgrounds and associations, or persons "`deficient in business probity'" are to be excluded or removed from any positions of authority or responsibility within casino gaming operations. Knight v. Margate, 86 N.J. 374, 381-82, 431 A.2d 833 (1981) (quoting N.J.S.A. 5:12-1b(7)). "`[P]ublic confidence and trust in the credibility and integrity of the regulatory process and of casino operations'" are integral and essential elements of the casino regulations. Ibid. As Justice Handler, speaking for the Knight Court, said:
As expressed in the Casino Control Act, which implements the Constitution's gambling clause, it is the pronounced policy of this State to regulate and control the casino industry with the utmost strictness to the end that public confidence and trust in the honesty and integrity of the State's regulatory machinery can be sustained.

[86 N.J. at 392, 431 A.2d 833.]
And as the Greenberg Court explained, a casino's vulnerability to organized crime
magnifies the importance of maintaining public trust in the integrity of the regulatory and judicial processes. A public perception that any improper influence has infiltrated those processes, however slightly, would undermine the trust that is essential to continued confidence in *167 the industry and, what is more important, in state government.

[99 N.J. at 574, 494 A.2d 294.]
To help ensure the integrity of the industry as well as the public's trust and confidence, the Commission has broad regulatory authority. N.J.S.A. 5:12-64. It must assure that an unqualified person has no "material involvement, directly or indirectly, with the licensed casino operation...." Ibid. The Commission may exercise "any proper power or authority necessary to perform the duties assigned to it by law, and no specific enumeration of powers in this act shall be read to limit the authority of the commission to administer this act." N.J.S.A. 5:12-75.
In this regulatory context, we agree with the State's position that N.J.S.A. 5:12-104b provides the Commission with the authority to review the severance agreement. It is manifestly clear that an agreement between a casino and its president directly relates to the "business of a proposed or existing casino hotel." What could be more fundamental to the preservation of public confidence in the industry than permitting the Commission to review a casino's employment agreement with its chief operating officer.
The facts in this case illustrate the need for regulatory oversight of agreements between casinos and their employees. Here, at the time the Commission acted upon the request for review and approval of the severance agreement, DiBartolomeo was no longer licensed. In fact he was disqualified and prohibited from being employed by a casino licensee. See N.J.S.A. 5:12-106c. The Division had performed an exhaustive investigation that recommended revocation of DiBartolomeo's license. The Commission found DiBartolomeo unqualified, having failed to establish his good character, honesty, integrity and financial responsibility. By order of February 28, 2001, DiBartolomeo was precluded from applying for or holding a casino license, and was prohibited from being employed by a casino licensee. The proposed severance agreement would have paid DiBartolomeo $750,000 for not working in an industry from which he had been legally barred. Payment under these circumstances would, as suggested by the State in its brief, "be violative of public policy and contrary to the purposes underlying the Act."
In support of his position, DiBartolomeo relies on the following language of N.J.S.A. 5:12-104b: "Any such agreement may be reviewed by the commission on the basis of the reasonableness of its terms, including the terms of compensation, and of the qualifications of the owners, officers, employees, and directors of any enterprise involved in the agreement...." (emphasis added). DiBartolomeo argues that the phrase "any enterprise" refers to vendors in the casino service industry, not casino employees. He relies in part on N.J.S.A. 5:12-12, which defines casino service industry as "[a]ny form of enterprise which provides casino applicants or licensees with goods or services regarding the realty, construction, maintenance, or business of a proposed or existing casino hotel...." DiBartolomeo submits that since the cited language of N.J.S.A. 5:12-12 is similar to the language of N.J.S.A. 5:12-104b, the latter statute, by its use of the term "any enterprise," references a provider of goods or services, rather than a casino employee. Although there is superficial appeal to DiBartolomeo's argument, such a construction would be inimical to the legislative intent underlying the Actstrict regulatory control to all aspects of the business of a licensed casino. His narrow reading of the statute fails to recognize that a contract between a casino and its president *168 has a significant impact upon the casino's business operations.
There is another reason the term "any enterprise" does not limit the scope of the statute to vendors in the casino service industry. The statute says: "[a]ny such agreement may be reviewed by the commission on the basis of the reasonableness of its terms, including the terms of compensation... and ... the qualifications of the owners ... of any enterprise involved in the agreement." N.J.S.A. 5:12-104b (emphasis added). Contrary to DiBartolomeo's position that this language limits the types of agreements the Commission may review to those with third parties, we view the word "including" as merely illustrative, not limiting. See Jackson v. Concord Co., 54 N.J. 113, 126-27, 253 A.2d 793 (1969) (holding that the word "include" is a word of enlargement, not limitation) (citations omitted). A contrary interpretation would be unresponsive to the broad regulatory powers afforded the Commission under the Act.
DiBartolomeo also relies upon N.J.A.C. 19:43-10.2, which lists various types of agreements casinos are required to maintain under N.J.S.A. 5:12-104b. He takes the regulation out of context. The regulation is found in Subchapter 10 of the regulations, see generally N.J.A.C. 19:40-1.1 to -19:43-16.2, which solely addresses the requirements for doing business with vendors. It does not speak to all other contracts to which a casino may be a party. As such, it does not limit the scope of N.J.S.A. 5:12-104b. See Fedders Fin. Corp. v. Director, Div. of Taxation, 96 N.J. 376, 392, 476 A.2d 741 (1984) (noting that regulations may not extend beyond the Legislature's intent as expressed in a statute) (citations omitted).
DiBartolomeo further argues that since Section 104b is silent as to the Commission's authority to review agreements involving casino employees, while Section 104a(3) specifically provides that agreements between a casino and its employees involving profit-sharing plans are reviewable by the Commission, a comparison of these two statutory provisions evidences the Legislature's intent to limit the Commission's authority to review a casino's contracts with its employees only to those contracts containing profit-sharing plans. That argument is without merit. Section 104a reads, in part:
a. (1) Unless otherwise provided in this subsection, no agreement which provides for the payment, however defined, of any direct or indirect interest ... of any money ... gambled at a casino ... or derived from casino gaming activity ... shall be lawful.
* * *
(3) Agreements between a casino licensee and its employees which provide for casino employee or casino key employee profit sharing and which are in writing and have been filed with the commission shall be lawful and effective only if expressly approved as to their terms by the commission.
In other words, subject to certain exceptions, such as employee profit-sharing plans, Section 104a renders unlawful certain agreements to which a casino may be a party. Section 104b, on the other hand, addresses the obligation of the casino to maintain agreements affecting its business operations, and gives the Commission, in its discretion, the right to review those agreements. Simply put, Section 104a prohibits a casino from entering into certain types of agreements, while Section 104b requires the casino to maintain agreements to which it is a party.
DiBartolomeo points out that since employee agreements are not specifically mentioned in Section 104b, they should be *169 excepted from its coverage. However, statutory exceptions "are not to be implied." New Mea Construction Corp. v. Harper, 203 N.J.Super. 486, 502, 497 A.2d 534 (App.Div.1985) (citations omitted). Here, consistent with the legislative intent underlying the Act, there was no need to specifically identify employment agreements in Section 104b, since these agreements are embodied in the statutory reference to agreements "regarding ... the business of a ... casino." That Section 104b does not specifically reference employment agreements, does not limit the Commission's authority to perform its functions under the Act. See N.J.S.A. 5:12-64; N.J.S.A. 5:12-75.
The Commission has always interpreted Section 104b broadly. Although DiBartolomeo argues in his brief that the Commission has not reviewed employment contracts in the past, he has submitted no authority to support his position. We give deference to the agency's construction of the statute, especially where, as in this case, such construction is consistent with the legislative intent. See Malone v. Fender, 80 N.J. 129, 137, 402 A.2d 240 (1979) (citations omitted). The language of Section 104b provides for review of all agreements that pertain to the business of a casino licensee. The Commission properly exercised its authority to review the severance agreement.

III
We next turn to DiBartolomeo's alternative arguments. DiBartolomeo argues that even if the Commission has the authority to void employment agreements, its decision was not supported by the record before it. Given the deference accorded an administrative agency's findings of fact, DiBartolomeo's argument with respect to this issue fails.
We may not substitute our judgment of the facts for that of an administrative agency. Campbell v. New Jersey Racing Comm'n, 169 N.J. 579, 587, 781 A.2d 1035 (2001) (citing Clowes v. Terminix Int'l Inc., 109 N.J. 575, 588, 538 A.2d 794 (1988)). The findings of fact made by an agency are binding on appeal when supported by adequate, substantial and credible evidence. Clowes, 109 N.J. at 588, 538 A.2d 794 (1988). Reversal is appropriate only when an appellate court finds the decision of the administrative agency to be "arbitrary, capricious or unreasonable[,]" or unsupported by the "substantial credible evidence in the record as a whole." Henry v. Rahway State Prison, 81 N.J. 571, 581, 410 A.2d 686 (1980) (citing Campbell v. Department of Civil Service, 39 N.J. 556, 562, 189 A.2d 712 (1963)).
Basically, an appellate court must determine whether the findings of fact:
could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard for the opportunity of the Commissioners who heard the witnesses to judge of their credibility.

[In re Application of Boardwalk Regency Corp. for a Casino License, 180 N.J.Super. 324, 333, 434 A.2d 1111 (App.Div.1981), aff'd as modified, 90 N.J. 361, 447 A.2d 1335 (1982).]
Thus, an appellate court must carefully consider "the agency's record and findings resting upon a determination of the worth, plausibility and consistency of that record." In re Hotel and Restaurant Employees and Bartenders Int'l Union Local 54, 203 N.J.Super. 297, 316, 496 A.2d 1111 (App.Div.) (citation omitted), certif. denied, 102 N.J. 352, 508 A.2d 223 (1985), cert. denied sub nom, 475 U.S. 1085, 106 S.Ct. 1467, 89 L.Ed.2d 723 (1986). Deference *170 is appropriate where the Commission decides technical matters lying within its special competence or where experience is a pertinent fact. In re Application of Boardwalk Regency Corp., 180 N.J.Super. at 333, 434 A.2d 1111 (citation omitted). If the Commission's findings and decision are supported by sufficient credible evidence, we
will not disturb them even in cases in which, had we been doing it, we would have done it differently. Proper respect for the obligation of the agency to accomplish its statutory obligations and consideration for implementation of the legislative intent in the manner designed by the Legislature causes us to proceed with especial restraint in agency matters.

[Id. at 334, 434 A.2d 1111 (citation omitted).]
Confronted with the likelihood of license revocation and termination, DiBartolomeo had negotiated with Caesars for severance benefits which were not part of his employment agreement. He asked the Commission to permit Caesars to pay him $750,000, even though he had been found unsuitable for continued licensure and was prohibited from employment by a casino in any capacity. The Commission focused on whether it was reasonable and financially responsible for Caesars to continue to pay an individual whose license had been revoked, and employment terminated. The Commission disapproved the proposed severance agreement. It concluded that payment under such circumstances would be violative of public policy and contrary to the purposes of the Act. We agree.
There is sufficient credible evidence to support the Commission's findings. DiBartolomeo was the president of Caesars and held a casino key employee license. After a hearing, the Commission revoked DiBartolomeo's license, having determined that he lacked the requisite good character, honesty and integrity necessary to be licensed. N.J.S.A. 5:12-89. More specifically, the Commission found that DiBartolomeo blatantly violated the terms of a Commission order, lied repeatedly to regulatory officials about his gambling, and testified falsely during his licensing hearing. The facts underlying these findings were not contested. On February 28, 2001 the Commission revoked his license. As a result, DiBartolomeo was prohibited from working for Caesars in any capacity. N.J.S.A. 5:12-106c. We find no reason to disturb the Commission's findings. To have awarded payment to DiBartolomeo for a period of time when he was not legally eligible to be employed by a casino, would not have fostered public confidence in the industry.

IV
We next address DiBartolomeo's argument that the rejection of the proposed severance agreement deprived him of his constitutional right to contract. This argument is also without merit. The federal constitution provides that "no state shall pass ... any ... law impairing the obligation of contracts." U.S. Const. art. I, § 10, cl. 1. The State Constitution has a similar provision. N.J. Const. art. IV, § 7, ¶ 3. Because of states' interests in safeguarding their residents, however, the prohibition against the impairment of contracts is not absolute; there is "wide discretion on the part of the legislature in determining what is and what is not necessary,a discretion which courts ordinarily will not interfere with." Manigault v. Springs, 199 U.S. 473, 480-81, 26 S.Ct. 127, 130, 50 L.Ed. 274, 279 (1905); In re Recycling & Salvage Corp., 246 N.J.Super. 79, 100-02, 586 A.2d 1300 (App.Div.1991). Accordingly, a statute infringes on the right to contract only when it 1) substantially impairs a contractual relationship; 2) *171 lacks a significant and legitimate public purpose; and 3) is based on unreasonable conditions and is unrelated to appropriate government objectives. State Farm Mutual Auto. Ins. Co. v. State, 124 N.J. 32, 64, 590 A.2d 191 (1991) (citation omitted).
Here, by virtue of the Commission's ruling, DiBartolomeo will receive about $200,000 (including the $30,000 in health benefits), instead of the $750,000 payment proposed in the severance agreement. Given this, it may be concluded that the provision "substantially impairs" DiBartolomeo's right to contract. Nonetheless, the Act addresses legitimate and important State interestsprotecting the integrity of the casino industry and fostering public trust in that industry. N.J.S.A. 5:12-1b(6); Bally Mfg. Corp. v. New Jersey Casino Control Comm'n, 85 N.J. 325, 426 A.2d 1000, appeal dismissed, 454 U.S. 804, 102 S.Ct. 77, 70 L.Ed.2d 74 (1981). Regulating contracts to which casino licensees are a party is designed to contribute to the public confidence and trust in the efficacy and integrity of the regulatory process. The impairment of DiBartolomeo's contract rights is, in balance, substantially outweighed by the policies underlying the Act.

V
We turn next to the question of whether the Commission retroactively abrogated DiBartolomeo's vested right to disability benefits. DiBartolomeo argues that because he had been diagnosed as a pathological gambler, and was admittedly disabled and unable to return to work as a result of that disability, he is entitled to disability benefits. Based on the language in his employment agreement that Caesars will provide him with "long term disability... retirement plans, ... and the like, afforded in general to senior officers" of the casino, DiBartolomeo argues that he has a contractual entitlement to disability benefits. The Commission properly denied this claim. It explained:
Petitioners' attempt to characterize these requested payments as `vested' contractual rights or deferred compensation for services rendered is totally unsupported by the record. On the contrary, the Employment Agreement expressly and unequivocally provides that the payment of a bonus is reserved to the discretion of the employer. Under such circumstances, it cannot reasonably be argued that the payment of a bonus is a vested contractual entitlement. Moreover, Petitioners also initially requested the approval of `salary continuation payments.' Belatedly, they have relabeled these payments to be `disability severance payments,' without any supporting documentation. We emphasize that DiBartolomeo's severance from the company was not occasioned by a disability, but rather was the direct result of our revocation action.... Benefits which had already accrued, such as salary and health benefits, were paid to DiBartolomeo.
In support of his position that the proposed payments are vested disability benefits, DiBartolomeo relies on the fact that the Commission found that he was disabled. While the Commission did find that DiBartolomeo was suffering from the disease of pathological gambling, the Commission also emphasized that this finding did not preclude him from demonstrating his suitability for licensure:
It bears emphasis that the status of being a compulsive gambler does not automatically deprive a person from obtaining or retaining a license. Rather, the issue is always whether the applicant or respondent is able to demonstrate suitability for licensure. In this context, a compulsive gambler's problem may *172 have dire consequences with respect to one's ability to demonstrate qualifications, but it is not necessarily fatal to an application.
Ultimately, when DiBartolomeo's license was revoked, it was done so because he was unable to establish the good character, honesty and integrity necessary for licensure. His termination resulted from the Commission's revocation of his license, and not as a result of a disability.
DiBartolomeo has also failed to demonstrate that the remuneration provided for in the proposed severance agreement is connected to the disability benefit referred to in his contract with Caesars. No written disability plan has been submitted to the Commission or this court. The fact that DiBartolomeo may have been an eligible participant in Caesars' employee disability plan does not translate to a contractual entitlement to receive the claimed severance benefits.
The Commission did not abrogate DiBartolomeo's contract rights. It simply terminated those portions of the proposed severance agreement which provided for payments to him without services rendered. Those portions which were invalidatedthe "bonus" payments beyond May 22, 2000 when DiBartolomeo's leave of absence began, and the "salary continuation" paymentswere to be paid for a period of time when he was not eligible to work for a casino. On the other hand, the requested bonus for the period of January 4 to May 22, 2000, when he was employed by Caesars, albeit on leave, was construed by the Commission as payment for services rendered, and accordingly, was approved.

VI
Our finding that the proposed severance agreement was not an agreement to pay DiBartolomeo disability benefits also bears on his claim that the Commission was preempted under the Employee Income Security Act (ERISA), 29 U.S.C.A. 1001 to -1461. This issue was not raised below, and, as such, we are not required to exercise our original jurisdiction. R. 2:10-5; Maisonet v. Department of Human Services, 140 N.J. 214, 222-23, 657 A.2d 1209 (1995). For purposes of closure, however, we will address it. We find that jurisdiction of the Commission is not preempted by ERISA because the proposed severance agreement did not constitute a disability benefits plan encompassed by ERISA.
ERISA contains a sweeping preemption provision that is intended to maintain uniformity in the enforcement of employee benefit plans. New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655-58, 115 S.Ct. 1671, 1676-78, 131 L.Ed.2d 695, 704-06 (1995); Morrone v. Thuring, 334 N.J.Super. 456, 470, 759 A.2d 1238 (Law Div.2000). ERISA "supercede[s] any and all State laws" that "relate to any employee benefit plan" by any employer engaged in commerce. 29 U.S.C.A. § 1144(a). A law "`relates to' an employee benefit plan" if it "has a connection with" or reference to such a plan, "even if the law is not specifically designed to affect such plans, or the effect is only indirect." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474, 484 (1990) (citations omitted); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490, 501 (1983). ERISA defines the term "employee welfare benefit plan" as:
[a] program which [is] established ... by an employer ..., to the extent that such plan ... was established ... for the purpose of providing ... through the purchase of insurance or otherwise,
*173 (A) ... benefits in the event of ... disability....

[29 U.S.C.A. 1002(1).]
DiBartolomeo relies on this provision to support his position that the proposed severance payment constitutes an ERISA plan. His argument is misplaced.
As previously noted, the preemptive purpose of ERISA is intended to provide employers with a uniform set of procedures for administering employee benefit plans. Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 11, 107 S.Ct. 2211, 2217, 96 L.Ed.2d 1, 11 (1987).
This concern only arises, however, with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation. It is for this reason that Congress pre-empted state laws relating to plans, rather than simply to benefits. Only a plan embodies a set of administrative practices vulnerable to the burden that would be imposed by a patchwork scheme of regulation.

[Id., 482 U.S. at 11-12, 107 S.Ct. at 2217, 96 L.Ed.2d at 11.]
The Fort Halifax Court based its decision on the fact that the employer assumed no responsibility to pay benefits on a regular basis and thus faced no periodic demand on its assets that created a need for financial coordination and control: "To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility." Id., 482 U.S. at 12, 107 S.Ct. at 2218, 96 L.Ed.2d at 12. Thus, the "touchstone for application of ERISA is the existence of an undertaking or obligation by an employer requiring the creation of an ongoing administrative program." Hijeck v. United Techs. Corp., 24 F.Supp.2d 243, 247 (D.Conn.1998) (citing Ibid.); see also Belanger v. Wyman-Gordon Co., 71 F.3d 451 (1st Cir.1995); Angst v. Mack Trucks, Inc., 969 F.2d 1530 (3d Cir.1992).
In the present case, the single disbursement of approximately $750,000 to DiBartolomeo would require no ongoing administrative scheme and therefore does not implicate ERISA under the Fort Halifax test. Nor does the two-year continuation of existing health benefits invoke the application of ERISA because the continuation of the benefits will presumably be administered under a pre-existing administrative scheme which will remain unaffected by the severance agreement.

VII
Two issues remain. DiBartolomeo argues (1) that the "reasonableness of its terms" standard enumerated in Section 104b is unconstitutionally void for vagueness, and (2) the Commission erroneously denied DiBartolomeo's motion to supplement the record and for reconsideration. We have carefully reviewed the record and the applicable law. We find that the arguments are without sufficient merit to warrant discussion in a full written opinion. See R. 2:11-3(e)(1)(D) & (E).
Affirmed.
NOTES
[1] Caesars is the trade name for Boardwalk Regency Corporation (BRC).
[2] We have affirmed the Commission's decision to revoke DiBartolomeo's casino license in a separate unpublished opinion rendered on this date. See In Re Qualification of Gary DiBartolomeo, A-3899-00.
[3] A one-year extension was authorized as a result of a change in the Act extending license renewal periods from two to four years. N.J.S.A. 5:12-88a (L. 1995, c. 18, § 26).
[4] N.J.S.A. 5:12-100n (footnote not in original).