874 A.2d 507

JAMES SZALONTAI, PLAINTIFF–APPELLANT, v. YAZBO'S SPORTS CAFÉ; MICHAEL SIMKO; FRANK HABERLE AND ANCO ENVIRONMENTAL SERVICES, INC., DEFENDANTS–RESPONDENTS, AND YAZBO'S SPORTS BAR; SIMKO'S PUB AND JOHN DOE, (BEING A FICTITIOUS NAME), DEFENDANTS.

Argued November 29, 2004—Decided May 26, 2005.

388

*Barry M. Packin,* argued the cause for appellant (*Mandelbaum, Salsburg, Gold, Lazris, Discenza & Steinberg,* attorneys; *Brian M. Gerstein,* on the briefs).

*Robert F. Ball,* argued the cause for respondents Yazbo's Sports Café and Frank H. Haberle (*Bolan Jahnsen Ball & Reardon,* attorneys; *Mr. Ball* and *Elizabeth A. Wilson,* on the briefs).

*Richard M. Mandel,* argued the cause for respondent ANCO Environmental Services, Inc. (*O'Brien, Liotta, Mandel & Kupfer,* attorneys; *Mr. Mandel* and *Roxanne De Francesco,* on the briefs).

*Anthony C. Cerciello,* submitted letters in lieu of brief on behalf of respondent Michael Simko (*Levitt & Cerciello,* attorneys).

Justice RIVERA–SOTO delivered the opinion of the Court.

This appeal requires that we again examine the boundaries that delimit the application of the doctrine of *res ipsa loquitur,* this time within the confines of the discovery deadlines that are part of our "best practices" requirements. We reaffirm that, before the doctrine of *res ipsa loquitur* operates to shift the burden of persuasion to the defendant in a negligence case, the plaintiff first must meet all of the elements of the three-part *res ipsa loquitur* test, and that a plaintiff's failure to prove any one of those elements by a preponderance of the evidence renders the doctrine

and its concomitant burden-shifting unavailable to that plaintiff. We also hold that, under our Rules of Court, discovery in all civil cases subject to discovery track assignment must be completed in a timely manner, and additional time for discovery is available only in the limited circumstances set forth in *Rule* 4:24–1(c).

## I.

For some time before December 1995, Michael Simko owned and operated "Simko's Pub" in the Borough of Sayreville, Middlesex County, New Jersey. In December 1995, Simko agreed to sell his business to Dennis Bello and Frank Haberle. Pursuant to their agreement of purchase and sale, Simko contracted with Anco Environmental Services, Inc. (Anco) to decommission and fill an underground storage tank on the premises of Simko's Pub. Anco drained the underground storage tank and then filled it with polyfill foam. Anco performed the work in January 1996, when Anco certified that "[t]he oil tank and the area in which the tank is located are now structurally secure against future collapse." Bello and Haberle renamed Simko's Pub as "Yazbo's Sports Café" and operated it much in the way Simko had previously operated Simko's Pub.

Several years later, at approximately 2:30 a.m. on July 17, 1999, plaintiff James Szalontai and his friend Sean Polletier left Yazbo's Sports Café. While the two men were walking on the paved portion of the parking lot towards plaintiff's car, the ground suddenly gave way and plaintiff's right leg up to his hip went into a hole, causing injuries to his right knee and lower back. Plaintiff explained that he was unaware of any holes in the parking lot of Yazbo's Sports Café and that the hole into which he fell did not exist until he stepped on that spot and the ground gave way. Shortly afterwards, Yazbo's Sports Café repaired the hole.

In December 2000, plaintiff filed a personal injury action against Yazbo's Sports Café and one of its owners (Haberle); Yazbo's Sports Café's predecessor Simko's Pub and its prior owner (Sim-

ko); Anco; and a fictitious defendant.[1] In his complaint, plaintiff charged Yazbo's Sports Café, Haberle, Simko's Pub and Simko with common law negligence by failing to maintain the parking lot, failing to inspect the parking lot, and creating a hazardous condition to their business invitees. Plaintiff's claim against Anco had a slightly different basis. According to plaintiff, Anco negligently performed its work in decommissioning and filling the underground storage tank.

Issues regarding service of process on some of the defendants, together with simple inaction in the case on plaintiff's behalf, consumed much of the period for discovery allotted to this case under *Rule* 4:24–1(a). As a result, on December 5, 2001, plaintiff sought, and none of the defendants opposed, an extension of the discovery period for an additional ninety days and, on January 11, 2002, the trial court granted that extension until April 12, 2002, ninety days following the entry of its order. From the filing of the complaint on December 7, 2000 until the expiration of the extended discovery date on April 12, 2002, the parties engaged in limited discovery, significantly only after the original discovery period had expired. Other than form interrogatories and six supplemental interrogatories with concomitant requests for production of documents propounded on January 7, 2001, no other discovery—no fact depositions, no site inspections, no expert reports or depositions—was propounded. Significantly, although plaintiff's second supplemental interrogatory asked "[w]as any work done at any time on any underground tanks located below

---

[1] In paragraphs 9 and 10 of his complaint, Szalontai alleged that the fictitious "John Doe" defendant was "the owner and/or operator of [Yazbo's Sports Café], operating as a bar/tavern, and was responsible for the ownership, operation, management, control, care, custody, maintenance and/or inspection of said establishment, as well as the sidewalks and parking lot abutting and serving said premises." The record is silent as to whether this fictitious "John Doe" defendant was intended to include Bello, the co-owner with Haberle, a named defendant, of Yazbo's Sports Café. Although Bello's existence became known to Szalontai—indeed, Szalontai called Bello as a witness both at arbitration and at trial—Szalontai never sought to substitute Bello as a party defendant in this action.

the property on which defendant's premises are located," plaintiff never sought to link causally the existence of any underground tank, and any work associated with the tank, to the spot where plaintiff was injured.

On April 23, 2002, twelve days after the extended discovery period expired, the case was arbitrated pursuant to the mandatory arbitration provisions of *Rule* 4:21A–1(a)(2). At the arbitration, plaintiff relied on the doctrine of *res ipsa loquitur* to establish liability against all defendants. In defense, Simko, the prior owner, testified that he did not recall making any repairs to the parking lot during the time he owned the property. Bello, one of the current owners, testified that there had been no construction, repaving or other work in the parking lot from the time he purchased the property from Simko until plaintiff's injuries, and that none of the many patrons and delivery and service personnel who used the parking lot ever complained about its condition. Bello confirmed that he would, from time to time when outside, check on the condition of the parking lot and never saw the need for repairs. Anco also put forth proofs at the arbitration, essentially to the effect that its decommissioning and filling work for the underground storage tank on Yazbo's Sports Café's property was nowhere near the spot where plaintiff fell.

At the conclusion of the arbitration, the arbitrator entered an award in favor of defendants and against plaintiff. Pursuant to *Rule* 4:21A–6(b)(1), plaintiff rejected the arbitration award and demanded a trial *de novo*. However, realizing his failure of proof, plaintiff finally secured the services of an expert civil engineer and, on May 16, 2002, forwarded a civil engineering expert report to defendants. Because the discovery period had expired over a month before, on May 20, 2002, plaintiff also sought leave of court to extend the discovery period for yet an additional sixty-day period. According to the certification of plaintiff's counsel,

[p]laintiff believed that this was a res ipsa loquitur case. However, the matter proceeded to arbitration less than a month ago. At that time and for the first time, defendants indicated that the tank decommissioning work might not have been done under the spot where plaintiff sustained his injury. Also the arbitrator did

not deem this a res ipsa loquitur case which plaintiffs [sic] believe to be an erroneous determination.

On the basis that the information disclosed by defendants in the arbitration, information that clearly would have been disclosed had any depositions been taken in this case, was somehow newly discovered and that defendants' failure to affirmatively defend the lawsuit by asserting that the underground storage tank was not located where plaintiff was injured, plaintiff claimed he was "entitled to obtain an expert and serve a report based on this new discovery." More striking is plaintiff's assertion that, supposedly based on this claimed newly-discovered evidence, "several individuals, including the plaintiff, need to be deposed." On the same day plaintiff filed this motion, the trial court listed the case for trial on July 22, 2002.

Not surprisingly, defendants opposed plaintiff's motion for an extension of the discovery deadline so as to allow the new expert report and separately cross-moved to bar proof of that report at trial. Both plaintiff's motion and defendants' cross-motions were returnable on June 7, 2002. The trial court denied plaintiff's motion to extend the discovery deadline, reasoning that, because the arbitration in this case had already been held, the standard plaintiff was required to meet under *Rule* 4:24–1(c) was a showing of exceptional circumstances, a showing plaintiff did not make. More generally, the trial court explained that "allowing discovery to reopen at this point ... would be using the arbitration procedure as almost a screening event to figure out where the weaknesses are" and, hence, cannot be countenanced. Consistent with that ruling, the trial court also ordered that the testimony of the late-tendered expert was barred at trial.

Trial did not start on its first scheduled July 22, 2002 date. Instead, on October 22, 2002, plaintiff moved for an order (1) reconsidering the denial of plaintiff's request to extend the discovery deadline, (2) reconsidering the bar against plaintiff's civil engineering expert witness at trial, (3) extending yet again the discovery period to allow an amendment to plaintiff's earlier answers to interrogatories so as to include a new expert report

from a new physician, (4) seeking an *in limine* finding that *res ipsa loquitur* governed this case, and (5) "[b]arring any testimony and/or evidence at the time of trial on behalf of [d]efendants concerning the underlying reason for the existence of the hole in which [p]laintiff fell."

Defendants substantively responded to plaintiff's motion; Anco also cross-moved for summary judgment based on a failure of proof causally linking Anco decommissioning and filling work on an underground storage tank not located where plaintiff was injured to plaintiff's injuries. On November 18, 2002, the trial court denied plaintiff's request for reconsideration of the earlier order denying an extension of the discovery deadline and barring plaintiff's civil engineering expert from the trial. The trial court also denied, albeit without prejudice, plaintiff's *in limine* request for a finding that *res ipsa loquitur* governed this case. The trial court granted plaintiff's motion for leave to amend his answers to interrogatories so as to allow a new physician's report, but also allowed defendants the right to submit responsive medical reports. Finally, the court granted Anco's cross-motion for summary judgment and dismissed all claims against it, explaining that "[t]here is nothing here for a rational factfinder to hold that Anco was negligent, or that [it was] responsible in any way for the happening of this accident." As a result, only plaintiff's claims against the property owner/operator defendants (Yazbo's Sports Café and one of its owners (Haberle), and Yazbo's Sports Café's predecessor Simko's Pub and its prior owner (Simko)) remained for trial.

At trial, based on the grant of summary judgment in favor of Anco, the property owner/operator defendants moved to preclude any evidence of a causal link between the underground storage tank and plaintiff's injuries. The trial court agreed and barred any such proofs. At the close of plaintiff's case on November 20, 2002, the property owner/operator defendants moved for an involuntary dismissal under *Rule* 4:37-2(b), claiming that plaintiff's liability proofs consisted solely of two facts—that plaintiff was walking through the parking lot at Yazbo's Sports Café and that a

hole suddenly opened below plaintiff's right foot—and that these two facts were insufficient. On finding that the two facts do not "bespeak negligence," the trial court refused to apply the doctrine of *res ipsa loquitur* and, instead, granted the property owner/operator defendants' motion for an involuntary dismissal.

Plaintiff appealed and the Appellate Division affirmed in an unpublished *per curiam* decision. *Szalontai v. Yazbo's Sports Café*, No. A–2171–02T1 (App.Div. Nov. 18, 2003). Focusing on the first of the two issues before this Court on certification, the Appellate Division found that plaintiff's request for an extension of the discovery deadline after the mandatory arbitration hearing had been held was governed by the "exceptional circumstances" standard of *Rule* 4:24–1(c) and that plaintiff had not satisfied that standard. The Appellate Division succinctly stated that plaintiff's "failure to conduct discovery until after he lost at the arbitration was sufficient reason to deny his motion to extend discovery." *Id.* at 9–10. On the second issue before us—whether *res ipsa loquitur* applies here—the Appellate Division held that plaintiff failed to establish a *prima facie* case warranting the application of the *res ipsa loquitur* doctrine. According to the panel, "to implicate the res ipsa doctrine, a plaintiff must demonstrate that the accident that produced the plaintiff's injury was one which ordinarily does not happen in the absence of negligence." *Id.* at 15. The Appellate Division concluded that

> [t]he facts in this case do not meet that test [that the accident ordinarily does not happen in the absence of negligence]. The hole in the ground may have been present for any number of reasons which had nothing to do with the negligence of the property owner. The ground could have settled, the water table could have risen, or perhaps a water pipe broke in the vicinity. The point is that plaintiff simply did not demonstrate the accident could not have happened absent defendants' negligence. The record is absent of any reason why the ground collapsed under plaintiff's foot. The doctrine of res ipsa loquitur is therefore inapplicable. *[Ibid.]*

We granted certification, 180 *N.J.* 454, 852 *A.*2d 191 (2004), and later requested that the parties submit supplemental briefs addressing the issue whether, under the circumstances of this case, a commercial establishment should have the burden of producing

evidence to demonstrate the absence of negligence. For the reasons that follow, we affirm the judgment of the Appellate Division. In doing so, we reject plaintiff's claim that he was prejudiced by the application of our "Best Practices" which denied plaintiff leave to extend the discovery deadline and barred his late-tendered liability expert from testifying at trial. We also reject plaintiff's claim that, under the facts present here, he should have been allowed to avail himself of an adverse inference under the *res ipsa loquitur* doctrine.

## II.

The mandate of *Rule* 4:24–1(c) could not be clearer: "[a]bsent exceptional circumstances, no extension of the discovery period may be permitted after an arbitration or trial date is fixed." *See also,* Pressler, *Current N.J. Court Rules,* comment on *R.* 4:24–1 ("Exceptional circumstances rather than good cause must, however be shown if an extension is sought beyond the day of notice of an arbitration or trial date."). The requirement of a showing of "exceptional circumstances" in lieu of the earlier requirement of a showing of "good cause" was added to rule revisions we approved in 2000 and known as "Best Practices." Klock, *N.J. Practice Court Rules Annotated, R.* 4:24–1 ("This rule was completely rewritten as of September 2000 as a result of the adoption of the Civil Best Practices recommendations."). The leading commentator on our Rules of Court has explained:

> The project known as "Best Practices," result[ing] in a number of significant rule amendments effective September 2000, was undertaken by the Conference of Civil Presiding Judges for the purpose of attempting to improve the efficiency and expedition of the litigation process as well as to restore state-wide uniformity to the wide range of discretionary and increasingly disparate judicial responses to such matters, among others, as the resolution of discovery problems and disputes, the fixing of trial calendars and adjournments of trial dates. The predicate of the project was that by amending the rules to provide for single-judge pretrial case management and by establishing realistic discovery periods according to the nature of each case, a discovery-completion target date could be enforceable, and if enforceable, credible trial dates could be set, ending the general expectation that a case would be reached for trial only after multiple adjournments. The techniques

for accomplishing the Best Practice goals address each stage of litigation from filing of the complaint to discovery, to arbitration and to trial.

[Pressler, *Current N.J. Court Rules*, comment 5 on *R*. 1:1–2.]

Although *Rule* 4:24–1(c) is of recent vintage, it has already been held that "[b]ecause of the liberalized time for discovery afforded by the tracking system embodied in 'Best Practices,' a heightened standard of 'exceptional circumstances' was adopted for any extension of discovery requested after an arbitration or trial date is fixed." *O'Donnell v. Ahmed*, 363 *N.J.Super.* 44, 50, 830 *A.2d* 924 (Law Div.2003). It is against this backdrop that plaintiff's post-arbitration request to extend an already expired discovery deadline must be gauged.

In this case, plaintiff's request for an extension of the discovery deadline was made not only after both the arbitration and trial date were fixed, but after the arbitration itself had been concluded and an award rendered, and on the very day the trial date was set. Moreover, that request included plaintiff's statement that even his own deposition needed to be taken.[2] Under those circumstances, we wholly endorse the trial court's rejection of plaintiff's request for an extension of the discovery deadline. In the words of the trial court:

> There were no depositions that were taken, there's just the report that was apparently put together by some expert and could have been—all the information in that report was available before the discovery ending. My concern in allowing discovery to reopen at this point is that we really would be using the arbitration procedure as almost a screening event to figure out where the weaknesses are; and then, after the arbitration, we'll go forward and plug in all the holes in our case, and I just don't think that's what arbitration is for. And I think if I were to allow this to proceed that would be undermining the whole effort of the court system to have discovery concluded prior to the arbitration.

[2] In the certification supporting his application to extend the discovery deadline, plaintiff asserted that "several individuals, *including the plaintiff*, need to be deposed." (emphasis supplied). One is at a loss to understand, and the record does not explain, why plaintiff needed to take his own deposition and, if so, what impediments prevented the taking of that deposition before the expiration of either the original discovery period or the extended discovery period.

## III.

As plaintiff represented time and again in certifications presented to the trial court, plaintiff proceeded as if this were "a classic *res ipsa loquitur* case." Thus we must examine whether we are presented with, in fact, a classic *res ipsa loquitur* case, that is, whether plaintiff adduced sufficient proofs at trial to invoke that doctrine. In doing so, we analyze separately plaintiff's claims against the property owner/operator defendants from those pressed against the entity that performed the underground storage tank decommissioning and filling work. We address first the limits of the doctrine.

### A.

*Brown v. Racquet Club of Bricktown,* 95 *N.J.* 280, 288-89, 471 *A.*2d 25 (1984), describes the application of the *res ipsa loquitur* doctrine:

> In any case founded upon negligence, the proofs ultimately must establish that defendant breached a duty of reasonable care, which constituted a proximate cause of the plaintiff's injuries. *Res ipsa loquitur*, a Latin phrase meaning "the thing speaks for itself," is a rule that governs the availability and adequacy of evidence of negligence in special circumstances. The rule creates an allowable inference of the defendant's want of due care when the following conditions have been shown: (a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality [causing the injury] was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect.

> The rule in effect creates a permissive presumption that a set of facts furnish reasonable grounds for the inference that if due care had been exercised by the person having control of the instrumentality causing the injury, the mishap would not have occurred. While the doctrine allows only an inference of negligence, it can create a powerful influence in the minds of the jury, and, as a practical matter, may very well shift the burden of persuasion. Once *res ipsa loquitur* is established, the case should go to the jury unless defendant's countervailing proof is so strong as to admit of no reasonable doubt as to the absence of negligence. In a case in which *res ipsa loquitur* applies, a directed verdict against the plaintiff can occur only if the defendant produces evidence which will destroy any reasonable inference of negligence, or so completely contradict it that reasonable men could no longer accept it.

[(citations and internal quotation marks omitted).]

The doctrine of *res ipsa loquitur* is subject, however, to limitation:

It is well settled that the existence of a possibility of a defendant's responsibility for a plaintiff's injuries is insufficient to impose liability. In the absence of direct evidence, it is incumbent upon the plaintiff to prove not only the existence of such possible responsibility, but the existence of such circumstances as would justify the inference that the injury was caused by the wrongful act of the defendant and would *exclude* the idea that it was due to a cause with which the defendant was unconnected. While proof of certainty is not required, the evidence must be such as to justify an inference of probability as distinguished from the mere possibility of negligence on the part of the defendant.

[*Hansen v. Eagle–Picher Lead Co.*, 8 *N.J.* 133, 141, 84 *A.*2d 281 (1951) (citations and internal quotation marks omitted).]

Early on, we debunked the notion that *res ipsa loquitur* carried some mystical meaning in the law, explaining:

*Res ipsa loquitur* . . . is simply an emanation of the basic legal doctrine that a verdict in a negligence case may rest on circumstantial evidence. If the phrase itself had never been coined, undoubtedly the procedural result it has produced over the years in the cases to which it has been applied, *i.e.*, submission to the jury of the question of the defendant's liability, would have been the same. The issue for determination would simply have been presented in terms of permissible inferences of negligence from the facts proved.

In its origin and early use the phrase did take on some rather clearly defined contours. It was said to be applicable when (1) the accident which produced a person's injury was one which ordinarily does not happen unless someone was negligent, (2) the instrumentality or agency which caused the accident was under the exclusive control of the defendant, and (3) the circumstances indicated that the untoward event was not caused or contributed to by any act or neglect on the part of the injured person. . . .

Application of the principal of *res ipsa loquitur* at the trial of cases must be engaged in with regard for the nature of its impact on the facts. Where the facts of a particular situation warrant its invocation, an inference of negligence may be drawn; it is not compelled. The facts are said to provide circumstantial evidence of negligence to be weighed, but not necessarily to be accepted as sufficient; they afford a basis for an inference of want of due care which the jury may, but need not, draw. Even in the absence of explanation by the defendant, the jury may properly conclude that the inference should not be drawn or that the facts are not adequate to sustain the plaintiff's ultimate burden of showing, to the degree required, the origin of the accident in the negligence of the defendant.

[*Lorenc v. Chemirad Corp.*, 37 *N.J.* 56, 70–71, 179 *A.*2d 401 (1962) (citations omitted).]

The doctrine of *res ipsa loquitur* "permits an inference of negligence that can satisfy the plaintiff's burden of proof, thereby

enabling the plaintiff to survive a motion to dismiss at the close of his or her case. The inference, however, does not shift the burden of proof." *Eaton v. Eaton,* 119 *N.J.* 628, 638, 575 *A.2d* 858 (1990) (citations omitted). More recently, we observed that

> [w]hether an occurrence ordinarily bespeaks negligence is based on the probabilities in favor of negligence. Hence, *res ipsa* is available if it is more probable than not that the defendant has been negligent. The doctrine does not shift the burden of persuasion to the defendant. Rather, what is required of defendant is an explanation, not exculpation. It shifts to the defendant the obligation to explain the causative circumstances because of defendant's superior knowledge. The doctrine confers upon the plaintiff an inference of negligence sufficient to establish a *prima facie* case at the close of plaintiff's evidence.
>
> [*Myrlak v. Port Auth. of N.Y. and N.J.,* 157 *N.J.* 84, 95–96, 723 *A.2d* 45 (1999) (citations and internal quotation marks omitted).]

 *Res ipsa loquitur* is not a panacea for the less-than-diligent plaintiff or the doomed negligence cause of action. Instead, *res ipsa loquitur*

> is a rule of law that has its origin in negligence and "governs the availability and adequacy of evidence of negligence in special circumstances." *Res ipsa loquitur* is not a theory of liability; rather it is an evidentiary rule that governs the adequacy of evidence in some negligence cases. Ordinarily, negligence is a[sic] "a fact which must be proved and which will never be presumed," and the burden of proving negligence in any particular case is on the plaintiff. The doctrine of *res ipsa loquitur,* where applicable, is a method of circumstantially proving the existence of negligence.
>
> [Id. at 95, 723 *A.2d* 45 (citations omitted).]

Regardless of the doctrine's application, a plaintiff nonetheless must satisfy its burden to proffer competent evidence that "reduces the likelihood of other causes so that the greater probability of fault lies at defendant's door." *Jimenez v. GNOC, Corp.,* 286 *N.J.Super.* 533, 545, 670 *A.2d* 24 (App.Div.), *certif. denied,* 145 *N.J.* 374, 678 *A.2d* 714 (1996).

### B.

 We now consider whether plaintiff's negligence claim meets the conditions for a *res ipsa loquitur* inference, that is, we ask was the occurrence itself—the act of a hole suddenly appearing beneath plaintiff's foot as he crossed the parking lot—one that ordinarily bespeaks negligence; was the hole into which plaintiff

fell within Yazbo's Sports Café's exclusive control; and is there any indication in the circumstances that plaintiff's injury was the result of his own voluntary act or neglect.

We are confident that the hole was within Yazbo's Sports Café's exclusive control, and there is no indication that plaintiff's injury was the result of his own voluntary act or neglect. Thus, plaintiff satisfies both the second and third prongs of the *res ipsa loquitur* test. However, plaintiff is unable to vault the first prong of the test, as he is unable to demonstrate that the appearance of this hole bespeaks negligence, that is to say, that it is causally related to the actions or failure to act of any of the property owner/operator defendants.

Here, the uncontradicted testimony was that the property owner/operator defendants periodically inspected the parking lot and saw nothing amiss. Further, there was no proof tendered whatsoever as to the cause of the hole or whether other similar holes had appeared on the property of the owner/operator defendants. We are mindful that, in addition to that absence of proof, and relying exclusively on his *res ipsa loquitur* claim, plaintiff took no steps to prove his claim: no depositions were taken, no site inspections were conducted, no soil borings were requested, and, most tellingly, no proofs were tendered from the person or entity that repaired the hole as to its genesis, characteristics or repair requirements. In short, plaintiff undertook no meaningful discovery to shore up his claim by circumstantial evidence and thereby prove from the outset that the property owners/operators somehow breached their duty of care to plaintiff. The conclusion is as plain as it is damning: in the absence of any circumstantial proof to the effect that a recognized duty of care has been breached, a plaintiff is not entitled to the inference of negligence that flows from the *res ipsa loquitur* doctrine.

Although neither advanced in his petition for certification nor otherwise briefed by the parties, at oral argument plaintiff complained that he was hampered, if not outright prevented, in his ability to establish the cause of the hole by the fact that Yazbo's

Sports Café fixed the hole shortly after plaintiff was injured. When asked whether plaintiff sought an adverse inference based on a claim of spoliation of evidence (that evidence in a civil action was destroyed purposely, resulting in an interference with the proper administration of justice and rendering the spoliating party subject to sanctions, *Rosenblit v. Zimmerman*, 166 *N.J.* 391, 401–07, 766 *A.*2d 749 (2001)), plaintiff declined to make that claim, perhaps because of the tension between a spoliation claim under the circumstances present here and our State's clear and long-standing public policy favoring subsequent remedial measures. *See Perry v. Levy*, 87 *N.J.L.* 670, 672, 94 *A.* 569 (E. & A.1915) ("[E]vidence of changes and repairs made subsequently to the injury, or as to precautions taken subsequently, to prevent recurrence of injury, is not admissible as showing negligence or as amounting to an admission of negligence [because] the effect of declaring such evidence competent would be to inform a defendant that if he makes changes or repairs, he does it under a penalty [that such remedial measures] operate[ ] as a confession that he was guilty of a prior wrong."). This strong public policy has been codified in our Evidence Rules. *See N.J.R.E.* 407 ("Evidence of remedial measures taken after an event is not admissible to prove that the event was caused by negligence or culpable conduct.").

 Our strong public policy encouraging prompt remedial measures, however, is meant as a shield, and not as a sword. Although the policy serves to insulate those who conscientiously repair dangerous conditions before any further injuries occur, it cannot and does not serve as a safe harbor for those who seek to destroy or otherwise make unavailable relevant evidence. In this case plaintiff took no steps to substantiate his claim and he similarly took no steps to show that the remedial measures undertaken by defendant were for any reason other than to correct what had become a dangerous condition.

## C.

 We then must address the far simpler task of whether the trial court properly entered summary judgment in favor of Anco

and against plaintiff. Here one need go no further than the facts themselves: the uncontradicted proofs demonstrated without doubt that Anco decommissioned the underground storage tank by emptying it of oil and filling it with polyfill foam, all without any digging or otherwise disturbing the ground and, more to the point, at a location other than where plaintiff's injury occurred. In light of the foregoing, the trial court properly followed the summary judgment injunction of *Rule* 4:46–2(c) ("The judgment or order sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."). *See generally Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 666 *A.*2d 146 (1995).

## IV.

The judgment of the Appellate Division is affirmed.

Justice LONG, concurring in part and dissenting in part.

I concur in the majority's conclusion that this is not a traditional *res ipsa loquitur* case insofar as it cannot be said that the occurrence of the cave-in "ordinarily bespeaks negligence." *Myrlak v. Port Auth. of N.Y. and N.J.*, 157 *N.J.* 84, 95, 723 *A.*2d 45 (1999) (stating, to invoke *res ipsa loquitur*, plaintiff must establish occurrence ordinarily bespeaks negligence, instrumentality within defendant's exclusive control, and injury not result of plaintiff's own voluntary act or neglect) (citing *Bornstein v. Metropolitan Bottling Co.*, 26 *N.J.* 263, 269, 139 *A.*2d 404 (1958)).

I part company from my colleagues in connection with the necessary implication of the majority opinion that the mere re-filling of the hole in the parking lot, into which the entirely innocent plaintiff fell, was an adequate response by the commercial landowner.

For me, the commercial landowner's plugging of the hole without taking steps to determine whether it is likely to recur at other

locations in the parking lot (as a result, for example, of underground hydrological or geological conditions) fell short. The commercial landowner owes a transcendent duty to the public to keep its commercial premises safe or to warn of known dangers. *Brown v. Racquet Club of Bricktown*, 95 *N.J.* 280, 290–91, 471 *A.*2d 25 (1984). That duty is breached in a case like this in which the landowner made no effort to isolate the cause of the cave-in, probably hoping (without any supportive evidence) that it was a freak accident that would not recur. That is nothing more than gambling with the safety of the public and should not be tolerated.

I would hold that the initial obligation to determine the cause of the cave-in falls on the commercial landowner who is not only in the best position to set the investigatory wheels in motion on his own property, but who also has a pre-existing and overarching duty to protect his invitees against hidden dangers of which he is aware. The commercial landowner can only satisfy that duty, on these facts, by immediately investigating the cause of the collapse and taking appropriate action or warning the public not to use the lot. Recognition of that obligation fully accords with the principles we established as relevant to a duty analysis in *Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 625 *A.*2d 1110 (1993): "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Id.* at 439, 625 *A.*2d 1110.

To be sure, plaintiff left much to be desired in the way he pursued the discovery aspect of this case. However, because the commercial landowner also fell far short in its much more important duty, I would reverse the trial court's order denying plaintiff's request for an extension of the discovery deadline. During the extension period, I would require the commercial landowner to attempt to ascertain the cause of the cave-in, share that information with plaintiff in discovery, and permit plaintiff to investigate further as well. After exchanging discovery, I would direct the trial judge to reconsider the motion to dismiss.

Justices ZAZZALI and ALBIN join in this opinion.

*For affirmance*—Chief Justice PORITZ and Justices LaVECCHIA, WALLACE and RIVERA-SOTO—4.

*Concurring in part; dissenting in part*—Justices LONG, ZAZZALI and ALBIN—3.