943 A.2d 188

I/M/O PETITION OF S.D. FOR REMOVAL FROM THE
VOLUNTARY SELF–EXCLUSION LIST.

Superior Court of New Jersey
Appellate Division

Argued December 19, 2007—Decided March 20, 2008.

Before Judges AXELRAD, PAYNE and MESSANO.

*Gerard W. Quinn,* argued the cause for appellant S.D. (*Cooper Levenson April Niedelman & Wagenheim,* attorneys; *Mr. Quinn,* on the brief).

*Gary A. Ehrlich,* Assistant Attorney General, argued the cause for respondent Division of Gaming Enforcement (*Anne Milgram,* Attorney General; attorney; *Yvonne G. Maher,* Assistant Attorney General, of counsel; *Mr. Ehrlich,* on the brief).

*Steven M. Ingis,* Assistant General Counsel, argued the cause for respondent New Jersey Casino Control Commission (*Dianna W. Fauntleroy,* General Counsel, attorney; *Mr. Ingis,* of counsel; *Teresa M. Nagengast,* Senior Counsel, on the brief).

The opinion of the court was delivered by

AXELRAD, J.A.D.

This appeal involves the issue of whether a self-professed problem gambler who placed himself on the New Jersey Casino Control Commission's (Commission) lifetime self-exclusion list (SEL) is entitled to removal from that list upon becoming aware that out-of-state casinos affiliated with those in New Jersey would also exclude him from their gaming facilities. The Commission denied S.D.'s petition for removal from the voluntary lifetime SEL, and we discern no basis to second-guess that decision.

We briefly recite the law on casino exclusions to place S.D.'s SEL application and removal request in context. The New Jersey Casino Control Act (Act), *N.J.S.A.* 5:12–1 to 210, provides two distinct types of casino exclusions. The first, involuntary exclu-

sion, has been part of the Act since 1977. It is reserved for organized crime figures, certain convicted criminals, and other individuals whose presence in a casino establishment would be inimical to the interests of New Jersey casino regulation. *N.J.S.A.* 5:12–71; *N.J.A.C.* 19:48–1.1 to –1.8. Persons on the involuntary exclusion list are barred from all areas of a licensed casino hotel facility, *N.J.A.C.* 19:43–7.8(b)1, and a violation of an involuntary exclusion order is punishable as a disorderly persons offense, *N.J.S.A.* 5:12–122. These persons are eligible to file a petition for removal from the involuntary exclusion list five years after placement, and may seek early consideration for removal in extraordinary circumstances. *N.J.A.C.* 19:48–1.8(a) and (d).

In 2001 the Legislature directed the second type of casino exclusion, voluntary self-exclusion from gaming activities, requiring the Commission to provide regulations establishing lists for individuals who identify themselves as problem gamblers and procedures for placement on, and removal from, the SEL.[1] *N.J.S.A.* 5:12–71.2 states:

> a. The commission shall provide by regulation for the establishment of a list of persons self-excluded from gaming activities at all licensed casinos and simulcasting facilities. Any person may request placement on the list of self-excluded persons by acknowledging in a manner to be established by the commission that the person is a problem gambler and by agreeing that, during any period of voluntary exclusion, the person may not collect any winnings or recover any losses resulting from any gaming activity at such casinos and facilities.

---

[1] The term "problem gambler" is not defined in the Act or the Commission's regulations. It is apparently a term of art, defined by the National Council on Problem Gambling as follows:

> Problem gambling is gambling behavior which causes disruptions in any major area of life: psychological, physical, social or vocational. The term "Problem Gambling" includes, but is not limited to, the condition known as "Pathological," or "Compulsive" Gambling, a progressive addiction characterized by increasing preoccupation with gambling, a need to bet more money more frequently, restlessness or irritability when attempting to stop, "chasing" losses, and loss of control manifested by continuation of the gambling behavior in spite of mounting, serious, negative consequences. [National Council on Problem Gambling, http://www.ncpgambling.org (last visited March 12, 2008).]

b. The regulations of the commission shall establish procedures for placements on, and removals from, the list of self-excluded persons. Such regulations shall establish procedures for the transmittal to licensed casinos and simulcasting facilities of identifying information concerning self-excluded persons, and shall require licensed casinos and simulcasting facilities to establish procedures designed, at a minimum, to remove self-excluded persons from targeted mailings or other forms of advertising or promotions and deny self-excluded persons access to credit, complementaries, check cashing privileges[,] club programs, and other similar benefits.

Pursuant to this instruction, the Commission promulgated the regulations establishing the SEL. *N.J.A.C.* 19:48–2.1 through –2.5. In doing so, the Commission looked to a number of sources, including the Council on Compulsive Gambling of New Jersey and jurisdictions such as Missouri to determine the terms and requirements of the SEL. The Commission decided to create three terms of self-exclusion: one year, five years, and lifetime. *N.J.A.C.* 19:48–2.2(c)(2).[2] The Commission also promulgated regulations providing for the removal from the SEL, with the express exception of removal of "those persons choosing a life-time self-exclusion." *N.J.A.C.* 19:48–2.5(a).

Once a person places him or herself on the SEL, the Commission regulations require each casino to: (1) refuse wagers from and deny any gambling privileges to such self-excluded person; (2) deny casino credit, check cashing privileges, player club membership, complimentary goods and services, junket participation and similar privileges and benefits to such self-excluded person; and (3) ensure such self-excluded persons do not receive, either from the casino licensee or its agent, junket solicitations, targeted

---

[2] Missouri, which was one of the first states to institute a casino self-exclusion program, provides that all self-exclusions are for life based on the Gaming Commission's "belief that dealing with a gambling problem requires lifetime treatment and that a person is continuously recovering from a gambling addiction." *Mo.Code Regs. Ann. tit.* 11 § 45–17.050(1). At oral argument, the Division of Gaming Enforcement's counsel informed us that the Commission considered that to be on the New Jersey SEL a person just needed to be a "problem gambler" and not necessarily a "compulsive gambler," and thus there could be a temporal component. As such, the Commission also chose to make available self-exclusion options short of lifetime as inducement for participation in and receipt of the benefits of the program.

mailings, telemarketing promotions, player club materials or other promotional materials relating to gaming activities at its licensed casino or simulcasting facility. *N.J.A.C.* 19:48–2.4(a)2, 3 and 4. Unlike individuals on the involuntary exclusion list, self-excluded persons are not statutorily prohibited from being present in any area of a casino hotel facility and are not subject to any sanction for violating the self-exclusion pact other than the forfeiture of any winnings. *N.J.S.A.* 5:12–71.3a and c. In essence, self-exclusion is designed as a means to help problem gamblers help themselves; it places responsibility squarely on self-excluded persons themselves to refrain from prohibited activities, albeit with the assistance and cooperation of the casinos. *See N.J.S.A.* 5:12–71.2c and e (providing for lack of liability of a licensed casino or simulcasting facility or its employee for failing to withhold gaming privileges from or permitting a self-excluded person from engaging in gaming activity or disclosing, other than a willfully unlawful disclosure, the identity of such self-excluded person).

As originally enacted, *N.J.S.A.* 5:71.2 provided "for the transmittal to licensed casino and simulcasting facilities of identifying information concerning self-excluded persons," *N.J.S.A.* 5:71.2b, with such lists otherwise remaining confidential under *N.J.S.A.* 5:12–71.2d. In 2002, *N.J.S.A.* 5:12–71.2d was amended to add the following, presumably to clarify that licensees with multiple casinos could share self-exclusion information:

> Nothing herein, however, shall be construed to prohibit a casino licensee from disclosing the identity of persons self-excluded pursuant to this section to affiliated gaming entities in this State or other jurisdictions for the limited purpose of assisting in the proper administration of responsible gaming programs operated by such gaming affiliated entities.
>
> [*L.* 2002, *c.* 65, § 12, eff. August 14, 2002.]

Pursuant to *N.J.S.A.* 5:12–71.2b, the Commission adopted a regulation prescribing a detailed application form to be used for the self-exclusion requests, *N.J.A.C.* 19:48–2.2, and produced the request form. The Commission also gratuitously created a "Self–Exclusion Questionnaire" to be completed by the applicant as part of the process.

On July 26, 2004, S.D., a forty-seven year-old Delaware resident, submitted an application for lifetime placement on the SEL. S.D. initialed and signed the questionnaire acknowledging, among other terms, that he was a problem gambler; that he authorized the New Jersey casinos and casino simulcasting facilities to exclude him from all gaming activities; that he read, understood, and had no questions about the instructions or request form; that he was not under the influence of any substances and did not have any condition preventing him from understanding the instructions, request form, and questionnaire; that he could request a copy of the statute and regulations; and that a representative of the Commission or Division of Gaming Enforcement (Division) reviewed the questions with him prior to his signing the request for voluntary exclusion. S.D. also initialed the following question:

> Do you understand that you have three options for your minimum self exclusion period: one year, five years, and lifetime? Do you understand that if you choose the one or five year options you will remain on the Self Exclusion List until such time as you submit a written request to the Casino Control Commission to terminate your voluntary self exclusion (after one year or five years, depending on terms selected)? Do you understand that if you choose the lifetime option you cannot request to be taken off the Self Exclusion List?

S.D. further signed the following acknowledgment on the prescribed application form:

> I am voluntarily requesting exclusion from all gaming activities at all New Jersey licensed casinos and simulcasting facilities because I am a problem gambler. I certify that the information that I have provided above is true and accurate, and that I have read and understood and agree to the waiver and release included with this request for self-exclusion. I am aware that my signature below authorizes the Casino Control Commission to direct all New Jersey Casino licensees to restrict my gaming activities in accordance with this request and, unless I have requested to be excluded for life, until such time as the Commission removes my name from the self-exclusion list in response to my written request to terminate my voluntary self-exclusion. I am aware and agree that during any period of self-exclusion, I shall not collect any winnings or recover any losses resulting from any gaming activity at all licensed casinos and simulcasting facilities and that any money or thing of value obtained by me from, or owed to me by, a casino licensee as a result of wagers made by me while on the self-exclusion list shall be subject to forfeiture.

On August 24, 2004, S.D. sent the Division a letter requesting the SEL lifetime ban be rescinded or downgraded to a one-year ban. He informed the Division he had banned himself from Atlantic City, which was near his home, because it would force him

to restrict his gambling to Las Vegas trips. However, he had received a letter from Caesars notifying him he would also be banned from their Las Vegas properties for life and claimed he would never have banned himself if he knew it would have excluded him from gambling in other parts of the country besides New Jersey.[3] The Division responded by letter dated August 27, 2004, advising there was no mechanism to remove someone from the SEL who had chosen the lifetime option but that it would refer S.D.'s letter to the Commission for its review. The Commission responded to S.D. with a letter similar to the Division's, further informing S.D. that Caesars' decision to include him in its new Responsible Gaming Program was a business decision on Caesars' part, which did not bind non-affiliated properties in other jurisdictions, and provided contact information for Caesars' responsible gaming manager if he wished to appeal that decision.

Following a series of letters and phone calls, on January 3, 2006, S.D. filed a formal petition with the Commission seeking an order removing him from the SEL. *See N.J.S.A.* 52:14B–8 (authorizing a declaratory ruling by an agency), *N.J.A.C.* 19:40–3.5 (designating the address for a petition for formal action by the Commission), *N.J.A.C.* 19:40–3.7 (authorizing declaratory rulings by the Commission). S.D. based his petition on his lack of knowledge, at the time he filed his request for voluntary exclusion, that it would have the effect of precluding him from gambling in casino facilities outside of New Jersey. S.D. contended if he had been aware of these consequences, he would not have requested placement on the SEL.[4] The Division opposed S.D.'s petition and briefs were submitted to the Commission.

---

[3] In a July 27, 2004 letter, Caesars Entertainment, Inc. informed S.D. of its new responsible gaming program creating a lifetime gambling ban enforced at all current and future properties owned and managed by Caesars Entertainment throughout the country and notified him that he was included in the program as a result of his participation in New Jersey's self-exclusion program.

[4] In a supplemental certification S.D. also contended he was not a compulsive gambler and submitted a supporting certification from a certified compulsive

The Commission considered the petition at its public meeting on January 17, 2007. S.D.'s counsel framed the issue as to "whether S.D. knowingly and voluntarily gave up the right which factually has occurred to gamble in dozens and dozens of casinos outside of the corners of New Jersey." He emphasized that the questionnaire S.D. signed did not address any potential extra-territorial consequences of New Jersey's self-exclusion and the fact that in December 2005, the Commission amended its questionnaire to include such a reference.[5] He stated that if S.D. signed up for a lifetime exclusion after the form was amended, he would not be appearing before the Commission "because [S.D.] would have been on notice through [its] forms that he would be excluded, not only from New Jersey but from other casinos around the country." The attorney emphasized several times during the hearing that he

---

gambling counselor; and blamed his "impulsive" decision to place himself on the SEL on the physical and mental stress of taking Xanax, being treated for anxiety, and becoming very angry that day because he had lost monies won earlier in the week. S.D. also claimed he immediately regretted his "hasty" decision and called the Commission when he got home, asking it to destroy the paperwork he executed that day, but was told it was too late. S.D. expressly abandoned those arguments at the hearing before the Commission.

[5] The Appellate record does not contain the December 2005 revision to the questionnaire. The current questionnaire, now titled "Self–Exclusion Program Check List," states, in pertinent part:

Do you understand that by signing the Request Form you are authorizing all New Jersey licensed casinos and simulcasting facilities to exclude you from all gaming activities? Do you understand that New Jersey licensed casinos and simulcasting facilities can share this information with their appropriate agents, including other New Jersey licensed casinos and affiliated gaming entities in other jurisdictions, for responsible gaming purposes? Do you understand that the responsible gaming programs of New Jersey licensed casinos and simulcasting facilities might be more strict than New Jersey's voluntary self-exclusion program, possibly resulting in you being excluded from all areas of a casino company's gaming and non-gaming properties in and outside of New Jersey and for a period of time longer than your chosen self-exclusion term?

[State of New Jersey, Casino Control Commission, Problem Gambling/self-exclusion, http://www.state.nj.us/casinos/liccns/info/docs/sel_app_20070104.pdf (last visited March 12, 2008).]

was not asking for S.D. to be taken off the lifetime SEL in New Jersey "as he signed up for that," noting S.D.'s thought process was that he did not want Atlantic City to be available to him because it was too easy to gamble in his backyard. S.D. argued, however, that because he did not know and was not informed by the Commission that his decision to place himself on New Jersey's SEL would have the far-reaching consequences of excluding him from about sixty to seventy New Jersey affiliated casinos around the country, the waiver of his rights was not knowing and voluntary. Therefore, "maybe the answer [was] that he ha[d] to be put back in a position before he signed up for this lifetime exclusion." S.D. analogized his situation to that of a criminal defendant who is permitted to retract a guilty plea entered without a full understanding of the consequences. Contending that had he known Atlantic City casinos could share the information with their "sister casinos," he would not have signed up for the New Jersey lifetime SEL, S.D. urged the Commission to rescind his application. S.D. further argued his case was unique because the questionnaire had been amended to provide the additional information and there were no other petitions filed challenging the prior format.

The Division responded that even if an analogy were drawn to criminal defendants, they must be informed of the direct consequences of a guilty plea. The Division argued that any potential out-of-state exclusion was a collateral consequence and thus unnecessary to disclose in connection with the SEL application. The Division also emphasized that the Commission's amendment of its form was not an acknowledgment of insufficiency of the form signed by S.D. under the case law. The Division further noted there was no regulation supporting the Commission's removal of a person who chose a lifetime self-exclusion, or directing casino licensees in other states to allow a participant in a New Jersey SEL to gamble in their facilities. Additionally, the Division reminded the Commission of the policy considerations and risk of undermining the self-exclusion program if it rescinded the application of S.D., a professed problem gambler who voluntarily agreed to a lifetime exclusion in New Jersey, solely because he was not

informed of the potential extra-territorial consequences of his placement.

Following argument, the Commission denied the relief sought by S.D. and memorialized the decision in an order dated January 17, 2007. S.D. appealed.

Pursuant to *Rule* 2:5–1(b), the Commission issued an amplifying decision on April 4, 2007. The Commission noted S.D. did not deny being told he could not request removal from the list when he chose the lifetime term of self-exclusion. The Commission also commented that S.D. proffered a variety of reasons for seeking removal from the SEL before focusing on his potential exclusion from non-New Jersey casinos. After summarizing both parties' positions and recognizing this was a matter of first impression, the Commission concluded that none of S.D.'s excuses justified the unusual relief he requested and denied his petition to remove himself from New Jersey's voluntary lifetime SEL. The Commission held that S.D. "has not been excluded for any unconstitutional or illegal reasons but [r]ather, S.D.'s exclusion is a result of S.D.'s voluntary actions, which were without any solicitation or coercion by the Commission." The Commission noted *N.J.S.A.* 5:12–71.2 and *N.J.A.C.* 19:48–2.5 did not allow for the relief requested by S.D. and permitting him to remove himself from the SEL because of, "as he puts it, his 'improvident decision made without having been made aware of the consequences of his request for self-exclusion,' would undermine the SEL program as it is currently implemented."

As to the impact, the Commission stressed S.D. was only precluded from entering some casinos. Moreover, the Commission noted that even if it granted S.D.'s request, there would be no guarantee that any licensed casino would follow suit. It commented that gambling is not a constitutionally protected activity, *United States v. Edge Broad. Co.,* 509 *U.S.* 418, 426, 113 *S.Ct.* 2696, 2703, 125 *L.Ed.*2d 345, 355 (1993), and the casino licensees could exclude from their premises whomever they chose, even in

the absence of an SEL, within the reasonable exercise of their responsible gaming program.

The Commission also rejected S.D.'s argument that its refusal to permit him to remove himself from the SEL relegated him to a fate worse than a criminal, stating:

> The United States Supreme Court has specifically held that "gambling ... implicates no constitutionally protected right; rather, it falls into a category of 'vice' activity that could be, and frequently has been, banned altogether." *United States v. Edge Broadcasting Co., supra*[,] 113 *S.Ct.* at 2703. The purpose of criminal law protections is to protect a **defendant's constitutional** rights; there is no similarly recognized constitutional right where gambling is concerned. Moreover, although the Commission rejects S.D.'s attempts to apply criminal law rules and procedures to the instant matter, we agree with the Division that, even if criminal law rules and procedures apply, and ignoring the applicable statutes and regulations, collateral consequences do not negate the voluntary actions of S.D. In fact, the courts have held that consequences such as forfeiture of office and deportation upon conviction are collateral and therefore, the failure of a defendant to be advised of and understand these consequences will not vitiate a guilty plea. *See State v. Heitzman*, 209 *N.J.Super.* 617, 508 *A.2d* 1161 (App.Div.1986), *aff'd o.b.*, 107 *N.J.* 609, 527 *A.2d* 442 (1987); *State v. Chung*, 210 *N.J.Super.* 427, 510 *A.2d* 72 (App.Div.1986). If deportation and forfeiture of office are considered collateral and thus insufficient to warrant a reversal of a guilty plea, the Commission feels comfortable concluding S.D.'s alleged harm of not being able to frequent some non-New Jersey casinos is also collateral, especially given the fact that, as there is no fundamental right to work in the Atlantic City casino industry, it is inconceivable there would be a fundamental right to gamble or frequent a casino. *See In re Petition of Atlantic City Press Requesting Certain Files of the Casino Control Commission*, 277 *N.J.Super.* 433, 445, 649 *A.2d* 1302 (App.Div.1994).

The Commission also expressed concern with "floodgate" ramifications of permitting revocation of applications based solely on their extra-territorial consequence, noting that New Jersey casino licensees that extended responsible gaming programs to their affiliates included persons enrolled for the one and five-year exclusion terms as well as the lifetime terms. As the Commission stated, "we strongly disagree with S.D. that there is no legitimate public policy interest served in refusing to allow someone to remove themselves from the SEL, be it from a one-year, five-year, or lifetime term, simply because the casino licensee has decided to take a proactive approach and aid[ ] in limiting access to casinos for those who state they are problem gamblers."

The Commission further pointed out that *N.J.S.A.* 5:12–71.2d specifically permitted the information-sharing about self-excluded persons between affiliated casinos and that the self-exclusion questionnaire expressly informed prospective enrollees they could request a copy of the statute and regulations. The Commission also found the revision of its questionnaire, done as part of its continuous updating and changing of forms over the five years of the SEL's existence "to more accurately reflect ongoing issues with the program," irrelevant to S.D.'s application or his requested relief, as neither the Act nor the regulations required the agency "to anticipate every possible future situation and warn prospective enrollees of such."

On appeal, S.D. argues the Commission erred in denying his petition to be removed from the SEL as he did not knowingly and voluntarily waive his fundamental rights. He contends the action of placing himself on the SEL is analogous to a party's waiver of a statutory or constitutional right in a civil action or of a criminal defendant's entry of a guilty plea, either of which would be void ab initio or subject to retraction if made without a full understanding of the consequences and the ramifications. He cites *Garfinkel v. Morristown Obstetrics & Gynecology Assocs.*, 168 *N.J.* 124, 136, 773 *A.*2d 665 (2001) (holding an arbitration clause in the parties' contract did not constitute an enforceable waiver of plaintiff's statutory rights under the Law Against Discrimination because the intention was not clearly and unmistakably established); *Fairfield Leasing Corp. v. Techni–Graphics, Inc.*, 256 *N.J.Super.* 538, 543, 607 *A.*2d 703 (Law Div. 1992) (holding a non-negotiated jury waiver clause appearing inconspicuously in a standardized form contract entered into without assistance of counsel would not be enforced because the constitutional right was not waived knowingly and intentionally); *State v. A.G.D.*, 178 *N.J.* 56, 68, 835 *A.*2d 291 (2003) (holding the government's failure to inform a suspect that a criminal complaint or arrest warrant has been filed or issued deprives that person of "information indispensable to a knowing and intelligent waiver of [his] right[ ] [to remain silent]"); and *State v. Warren*, 115 *N.J.* 433, 444, 558 *A.*2d 1312 (1989) (stating

120

that in plea bargaining, "all material terms and relevant consequences must be clearly disclosed, fully understood, and knowingly and voluntarily accepted by the defendant").

Though not conceding his lack of a constitutional or fundamental right to gamble, S.D. emphasizes the issue here is his associational right to enter a place of public accommodation, such as a casino hotel facility in Las Vegas, without fear of apprehension and exclusion, when he has done absolutely nothing wrong. S.D. argues his status on New Jersey's SEL adversely affects this right because he has not simply been precluded from gambling or from recovering his gambling winnings, which were the consequences the Commission informed him of when he enrolled in the voluntary program. Moreover, S.D. urges the consequences are more onerous because of the lifetime ban. S.D. emphasizes that had he known he could be excluded from some non-New Jersey casinos, he would not have sought placement on the SEL. He points to the Commission's subsequent revision to its form as an acknowledgement that the agency views this as a significant consequence of placement on the SEL and that such information should have been provided to persons considering self-exclusion in order for them to make a knowing and intelligent waiver of rights. S.D. also urges that fundamental fairness, including his unique situation and the overall totality of the circumstances, warrants removal of his name from the lifetime SEL.[6]

---

[6] S.D. also raised, for the first time on appeal, an alternative ground for reversal of the Commission's decision, namely, that the Commission's regulatory scheme is "inadequate and at odds with" the legislation creating the SEL, *N.J.S.A.* 5:12–71.2b, which directed the Commission to establish procedures for both "placements on and removal from the list of self-excluded persons." He also urged it is contrary to the way the Commission treats criminals and other undesirables who have been placed on the involuntary self-exclusion list, because it provides no mechanism for a person who placed him or herself on the lifetime SEL to be removed from that list.

However, S.D. did not seek to strike the portion of *N.J.A.C.* 19:48–2.5(a) excepting persons choosing a life-time self-exclusion from the procedure for requesting removal from the list. In fact, S.D.'s counsel informed us at oral argument S.D. was not asserting a facial challenge to the regulation nor was

 We will not upset the determination of an administrative agency absent a showing that it was arbitrary, capricious or unreasonable; that it lacked fair support in the evidence; or that it violated legislative policies expressed or implied in the act governing the agency. *In re Musick,* 143 *N.J.* 206, 216, 670 *A.2d* 11 (1996); *Campbell v. Dep't of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.2d* 712 (1963); *Boardwalk Regency Corp. v. N.J Casino Control Comm'n,* 352 *N.J.Super.* 285, 306, 800 *A.2d* 157 (App.Div.), *certif. denied,* 174 *N.J.* 366, 807 *A.2d* 197 (2002). "Deference is appropriate where the Commission decides technical matters lying within its special competence or where experience is a pertinent fact." *Boardwalk Regency Corp., supra,* 352 *N.J.Super.* at 307, 800 *A.2d* 157. Moreover, an appellate court will not substitute its judgment for that of an administrative agency unless the agency's determination is "so plainly unwarranted that the interests of justice demand intervention and correction[.]" *Clowes v. Terminix Int'l Inc.,* 109 *N.J.* 575, 588, 538 *A.2d* 794 (1988) (quoting *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.2d* 809 (1964)).

At the hearing, S.D. did not challenge that he voluntarily sought lifetime placement on the SEL, acknowledging both that he was a "problem gambler" and that he received express notice that if he chose this option he could not request to be taken off the SEL. S.D. admittedly requested, with full knowledge and intent, the direct statutory consequence of his placement on the SEL, namely a lifetime ban from New Jersey casinos. *N.J.S.A.* 5:12–71.2; *N.J.S.A.* 5:12–71.3; *N.J.A.C.* 19:48–2.1 through –2.5. S.D.'s counsel conceded these points before the Commission, stating at various times during oral argument, for example, that S.D. did not want to

---

he challenging the regulatory scheme as applied to him, as violative of procedural or substantive due process, since he was afforded the opportunity to present all of his evidence and arguments to the Commission in support of his application for removal from the SEL. Rather, the gist of the argument S.D. advanced on this point was a re-iteration that the unique facts of his case merited revocation of his application for lifetime self-exclusion in New Jersey. This challenge is essentially a disagreement with the agency's decision, which we address, and reject, in our discussion of S.D.'s first point on appeal.

be able to gamble in his own backyard in Atlantic City because it was "too easy" and that he was not asking for S.D. to be taken off the lifetime SEL in New Jersey "as he signed up for that." S.D. sought revocation of his voluntary enrollment solely because the Commission did not inform him of possible exclusion from out-of-state casinos, an indirect extra-territorial consequence over which the agency had no control.

■ We are satisfied the Commission had ample basis in fact, law, and public policy to deny S.D.'s request for removal from the lifetime SEL and perceive of no grounds upon which to second-guess the agency's decision. As the Commission recognized, S.D. has no fundamental right to gamble, constitutionally or statutorily. S.D. voluntarily relinquished whatever right he had to participate in gaming activities in New Jersey when he placed himself on the lifetime SEL as a self-professed "problem gambler." That such self exclusion may adversely impact S.D.'s ability to frequent some casinos outside of New Jersey is not a material element of the New Jersey agreement; it falls squarely in the category of an indirect collateral consequence. S.D.'s inability to legally gamble outside of New Jersey or to be present in any non-New Jersey casino facility was not mandated by the statute or regulations establishing the SEL nor was his ability to gamble out-of-state taken away from him by the Commission. Rather, the exclusion resulted solely from the voluntary and changing policies of private parent companies of New Jersey casino licensees, who are neither bound by New Jersey's SEL enrollment nor the duration period selected by the applicant. This is a consequence beyond the Commission's jurisdiction to ascertain and enforce. Thus, S.D.'s recourse lies not with the Commission, but with the individual casinos which have implemented responsible gaming programs that exclude him from their establishments.

Nor is this a situation where the Commission withheld information or misled S.D. about the consequences of his enrollment in the program. In hindsight, it might have been preferable for the Commission to have included express notification of the informa-

tion-sharing provision of the Act in its questionnaire, but we are not convinced this omission was fatal to S.D.'s knowing and voluntary enrollment into New Jersey's lifetime SEL. We note the Commission's disclaimer provided that the questionnaire did not encompass a complete explanation of the program and that the statute and regulations were available for review. We discern no basis upon which to hold the Commission responsible to inform S.D. of the potential collateral national implications of evolving responsible gaming programs beyond its knowledge, jurisdiction, and control. This is particularly so in this type of situation where the Commission represents it was unaware individuals on the SEL were being excluded from affiliated properties outside of New Jersey at the time of S.D.'s application.

Even using S.D.'s criminal law analogy, which we agree with the Commission is not applicable to this civil proceeding, consent to a guilty plea is not negated by the lack of understanding of collateral consequences, *State v. Bellamy*, 178 *N.J.* 127, 134, 835 *A.*2d 1231 (2003), which include restitution, deportation, loss of employment, automobile license suspension, dishonorable discharge, and the loss of voting rights. *State v. Samuels*, 253 *N.J.Super.* 335, 341, 601 *A.*2d 784 (Law Div.1991). Clearly, exclusion from a limited number of out-of-state casinos that are affiliated with New Jersey casino companies and have responsible gaming programs applied to individuals who have self-excluded in New Jersey is a far less serious collateral consequence. Thus, even under general due process standards, the potential extra-territorial exclusion, and the absence of notification by the Commission at the time S.D. signed up for the SEL of such a collateral consequence, do not render his validly executed, consensual application void ab initio or otherwise revocable. *See In re Freshwater Wetlands Permits*, 185 *N.J.* 452, 466–67, 888 *A.*2d 441 (2006) ("The process due in any particular case depends on the property interest at stake and the nature of the deprivation.... Because due process is a flexible and fact-sensitive concept, its demands will be a function of what reason and justice require under the circumstances.").

We, too, reject S.D.'s argument that the Commission's revision of its questionnaire in 2005 to include reference to this potential consequence conclusively demonstrates the agency's acknowledgement of a duty to disclose this information to prospective enrollees in the SEL and of the insufficiency of the prior form signed by S.D. The questionnaire provided to S.D. was not required by the statutory scheme of the Act nor its regulations, *N.J.S.A.* 5:12–71.2, *N.J.A.C.* 19:48–2.2. In its discretion, the Commission decided to prepare an additional summary to highlight what it considered to be the material ramifications of enrollment in the SEL and to further acknowledge the applicant's knowing and voluntary participation. It was an evolving form as evident from the notation on S.D.'s questionnaire that it had been revised on February 4, 2004. When the Commission became aware that individuals on the SEL were being excluded from affiliated casino properties outside of New Jersey pursuant to alternative responsible gaming programs, it gratuitously chose to share this information with potential enrollees in New Jersey so they would have all the facts that the agency had available, not because the agency was legally obligated to impart this collateral information. The Commission acted appropriately and responsibly in revising its questionnaire and disclosing additional information it deemed pertinent.

■ Moreover, our state has had a clear and longstanding public policy favoring the immunization of remedial measures from negative inferences. *See Szalontai v. Yazbo's Sports Café*, 183 *N.J.* 386, 402, 874 *A.*2d 507 (2005) (holding that evidence of changes and repairs made subsequent to the injury, or as to precautions taken subsequently, to prevent recurrence or injury, is not admissible to show negligence); *N.J.R.E.* 407 ("Evidence of remedial measures taken after an event is not admissible to prove that the event was caused by negligence or culpable conduct."). Administrative agencies would be deterred from improving their procedures or updating their forms in response to evolving situations if their mere act of doing so could constitute an admission that the prior procedures or forms were invalid or void.

The Legislature recognized the need for a voluntary program for self-professed problem gamblers to exclude themselves from casinos and simulcasting facilities in New Jersey and entrusted this program to the Commission to administer within its broad powers and expertise. We defer to the agency's expertise and experience in assessing the uniqueness of S.D.'s circumstances from a policy basis and its conclusion that the salutary aims of the SEL would be compromised by rescinding the application of this acknowledged "problem gambler" who voluntarily agreed to a lifetime exclusion in New Jersey solely because he was not informed that he might be excluded from some out-of-state casinos.

Affirmed.